BOARD OF EDUCATION, LEVITTOWN UNION FREE SCHOOL DISTRICT et al., Respondents-Appellants, and BOARD OF EDUCATION, CITY SCHOOL DISTRICT, ROCHESTER et al., Intervenors-Respondents, v EWALD B. NYQUIST, as Commissioner of Education, et al., Appellants-Respondents.

Second Department, October 26, 1981

**APPEARANCES OF COUNSEL**

*Robert Abrams,* Attorney-General *(Shirley Adelson Siegel, Amy Juviler, Rosalind S. Fink, Robert L. Schonfeld, Clement H. Berne* and *Evelyn Tenenbaum* of counsel), for appellants-respondents.

*Kramer, Lowenstein, Nessen, Kamin & Soll (Daniel P. Levitt* and *Alan Jay Stein* of counsel), for respondents-appellants.

*John Silard, Joseph L. Rauh, Jr., Elliott C. Lichtman* and *Mary M. Levy (Rauh, Silard & Lichtman)* for intervenors-respondents. *(Adam Kaufman* for Rochester Board of Education; *Allen G. Schwartz, New York City Corporation Counsel [James G. Greilsheimer* and *Doron Gopstein]* of counsel; *David M. Garber, Syracuse Corporation Counsel;* and *Joseph P. McNamara, Buffalo Corporation Counsel).*

*Shearman & Sterling (Wayne D. Collins, William M. Kelly* and *Dennis P. Orr* of counsel), for Public Education Association and others, *amici curiae.*

OPINION OF THE COURT

LAZER, J.

The educational command of New York's Constitution is simple and direct: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of the state may be educated."[1] That simple sentence comprises the essential constitutional underpinning for a multifaceted fiscal and administrative structure encompassing a central authority, more than 700 school districts, and over 4,000 schools in which some 200,000 professionals conduct the education of 3,000,000 of the State's children. Twenty-seven of the school districts, four of the five largest cities in the State, and a number of school children and their parents have joined in challenging the statutory scheme under which the public educational system receives its fiscal support. Basing its conclusions on detailed findings of fact, the trial court (94 Misc 2d 466) has declared the public school finance system violative of the equal protection clauses of the State and Federal Constitutions and the education article of the State Constitution. Although we depart from a portion of the rationale for the trial court's opinion and disagree with its determination of the Federal question, we concur with the ultimate conclusion — New York's method of financing public education is constitutionally defective.

I

This litigation symptomizes the continuing struggle between dual forces: the desire of society's members to have educational opportunity for all children and the desire of individual families to provide the best education they can afford for their own children.[2] The struggle has been spurred to its current stage of intensity by two sociodemographic events — the post-World War II population explosion with its attendant out-migration from city to suburb

1. NY Const, art XI, § 1.
2. Foreword by Professor James S. Coleman to Coons, Clune & Sugarman, Private Wealth and Public Education, p vii.

and the in-migration of the poor and disadvantaged to the cities.[3] With the decline of the cities and the emergence of wide variances in suburban community wealth, disparities in the quality of education based upon real estate wealth have spawned widespread dissatisfaction with property-oriented educational finance systems. While the ensuing litigation first focused on the Federal Constitution, subsequent judicial events have transformed the critical question — the existence of a constitutional requirement for equal educational opportunity — to one of State constitutional interpretation.

Early in the recent decade — which witnessed school finance litigation in nearly two thirds of the States[4] — the California Supreme Court concluded that differences in educational quality based on the wealth of a child's parents or neighbors undermined core principles of representative government and violated guarantees of equal protection of the law (see *Serrano v Priest,* 5 Cal 3d 584 [1972; *Serrano v Priest* (I)]). The post-*Serrano* wave of educational finance reform[5] was quickly stifled, however, when the United States Supreme Court found school district wealth not a suspect classification, education not a fundamental right and the equal protection mandate of the Fourteenth Amendment not contravened by the Texas method of financing education (see *San Antonio School Dist. v Rodriguez,* 411 US 1 [1973]). Although two of our neighbor States subsequently determined that their educational finance systems did not meet the mandates of their State Constitutions (see *Robinson v Cahill,* 62 NJ 473 [1973], cert den *sub nom. Dickey v Robinson,* 414 US 976; *Horton v Meskill,* 172 Conn 615 [1977]), and California took the same path (see *Serrano v Priest* [II], 18 Cal 3d 728 [1976]), the pall of *Rodriguez* continues to overcast all educational finance jurisprudence.

---

3. Thomas, Equalizing Educational Opportunity Through School Finance Reform: A Review Assessment, 48 U of Cin L Rev 255.

4. Levin, Current Trends in School Finance Reform Litigation: A Commentary, 1977 Duke L J 1099. Legal attacks on school finance systems commenced in the late 1960's. See *McInnis v Shapiro,* 293 F Supp 327, affd *sub nom. McInnis v Ogilvie,* 394 US 322; *Burruss v Wilkerson,* 310 F Supp 572, affd 397 US 44.

5. Grubb, The First Round of Legislative Reforms in the Post-*Serrano* World, 38 Law and Contemporary Problems 459.

This State's litigation commenced in June of 1974 when the Board of Education of the Levittown Union Free School District joined with the boards of 26 other districts and 12 elementary and high school students to seek judgment declaring the method of financing the State's public education system unconstitutional. The Boards of Education of four of the five largest cities in the State — New York City, Buffalo, Rochester and Syracuse — plus 12 city school children subsequently served a separate complaint as intervenor-plaintiffs. The defendants are the Commissioners of Education and of Taxation and Finance of the State of New York, the State Comptroller, and the University of the State.

Both groups of plaintiffs claim that New York's method of financing public education violates the State[6] and Federal equal protection clauses and section 1 of article XI of the State Constitution.[7] The original plaintiffs contend that the quality of education actually delivered by the State depends upon the degree of real estate wealth within the respective school districts. With most educational revenue deriving from local real property taxes, the same rate of taxation produces gross disparities in per pupil tax yield between districts rich and poor in realty wealth, depriving the poor of the ability to match the rich in per pupil expenditures and quality of educational services even if they tax at higher rates than do the rich. Since State aid formulas are inadequate and often counterproductive in their equalization aspects, low-wealth districts cannot furnish what is obtainable elsewhere — smaller class size, more experienced and effective teachers, low student/teacher ratios, broader curricula, extensive extracurricular activities, more modern equipment and special programs for both the disadvantaged and the specially gifted. New York thus denies plaintiffs the educational resources available to wealthy districts and compels the offer of inferior education in contravention of the equal protection clauses of the State and Federal Constitutions.

---

6. The first sentence of section 11 of article I of the New York Constitution declares: "No person shall be denied the equal protection of the laws of this State or any subdivision thereof."

7. "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of the state may be educated."

The statutory scheme is also attacked as violative of the education article of the State Constitution, which the original plaintiffs view as envisioning a single State-wide school system instead of more than 700 distinct systems under which students, who may be equivalent except for district of residence, do not receive equivalent educational advantages. In selecting a financial structure which permits the existence of such gross disparities, New York has failed to fulfill its duty to provide a "system" where "all the children" of the State may be educated.

The intervenor cities argue that despite their real property resources they are so fiscally incapacitated by "municipal overburden", labor market differences and needs differentials as to be the least capable of relying on locally raised revenues to finance education. The overburden results from the necessity to devote such high proportions of the municipal tax base to noneducational services as to deprive education of its rightful due. Furthermore, the State's equalizing devices bear no fair and substantial relationship to equalization of capacity because they measure capacity by per pupil property wealth, and the special statutes designed to assist districts with pupils requiring compensatory school services provide less per pupil aid to the urban districts which have the highest concentration of such children.

In response, the defendants first challenge the justiciability of the issues and the plaintiffs' standing to maintain the action. On the merits, they assert that the State Constitution requires only that the State guarantee sufficient funds to ensure a basic minimum education for all its children, and that the constitutional requirement has been met by the current education system; that the legislative scheme for financing education is a rational one designed to preserve local control over education; and that the numerous components for distributing State aid under the formulas are rational exercises of legislative judgment. Finally, the defendants contest the intervenors' assertions that inexorable municipal and educational overburdens require compensatory adjustments in the aid formulas to reflect these urban realities.

After a trial spanning 122 days, 23,000 pages of transcript and involving the testimony of 128 witnesses and the admission of 400 exhibits, Trial Term rendered 487 findings of fact and, in a remarkable opinion *(Board of Educ. v Nyquist,* 94 Misc 2d 466, *supra),* concluded that New York's school finance system violated the equal protection and education clauses of the State Constitution and, in the case of the intervenors, the Federal equal protection clause as well. Nonetheless, the court found that the use of local school districts and reliance on local taxation was consonant with the Federal and State Constitutions and, while retaining jurisdiction, permitted the existing school finance system to continue until requisite changes were made or an injunction issued. In their appeals, the defendants seek reversal, and the original plaintiffs seek an additional declaration that the financing system is violative of the Federal equal protection clause as to them.

## II

Trial Term's requisite focus was upon the finance system as it existed in 1974, including the State aid formula enacted that year (see L 1974, chs 53, 718), but that prescription has been further altered since the trial (see L 1978, chs 53, 74, 593; L 1979, chs 53, 288; L 1980, chs 53, 352, 678; L 1981, chs 53, 148). Since it is our obligation to decide these appeals based on the law as it exists at the time of appellate decision *(Fruhling v Amalgamated Housing Corp.,* 9 NY2d 541, app dsmd 368 US 70; *Strauss v University of State of N. Y.,* 2 NY2d 464, app dsmd 355 US 394, reh den 355 US 968; *Black Riv. Regulating Dist. v Adirondack League Club,* 307 NY 475; *United States v Schooner Peggy,* 1 Cranch [5 US] 103), we have been compelled to evaluate the legislation which has intervened since the trial court rendered its decision. As a consequence — and despite the delays inherent in the process — we have solicited the parties' views as to the effects of the legislative changes and their suggestions for further findings of fact. On the basis of our scrutiny of the trial record, and analysis of the more recent statutes and various State Education Department computer runs which the parties have by stipulation made part of the record, we are modifying some of the trial court's findings and inserting a

number of entirely new ones. Nevertheless, in affirming the great majority of Trial Term's findings, we are convinced that the intervening statutory alterations have worked no substantial change in the substance of the conditions found by that court. If those conditions sufficed to render the educational finance structure constitutionally deficient, legislative amendments have not cured the malady. We briefly summarize here some of the essential factual conclusions we have reached.[8]

The State's educational funding sources are composed of local taxes, State appropriations and Federal aid. Independent school districts possess the power to tax real property while cities with populations that exceed 125,000 have a range of revenue raising measures, including real property taxes, with which to defray all municipal expenses, including education. Fifty-five per cent of educational funds originate locally, 40% comes from the State, and the balance derives from Federal sources.

In 1925, the Legislature initiated the "foundation grant" system of providing aid to education — a method which underwent numerous modifications in the decades that followed.[9] The 1974 formula in effect at the time of trial entitled each school district to obtain State assistance in raising a support figure of $1,200 per aidable pupil unit by levying a hypothetical 15 mill tax upon the full value of its real property tax base. This formulation was altered by a "two-tier" arrangement adopted in 1978 (L 1978, ch 74, § 5) and further modified in 1980 (L 1980, ch 53) and 1981 (L 1981, ch 53). The first tier of the current prescription

8. The detailed findings which provide the comprehensive basis for our factual conclusions, have been approved by the court and constitute an appendix to this opinion.

9. New York's foundation grant system originated in the Cole-Rice Law of 1925 (L 1925, ch 675) following the Strayer and Haig report of 1923 (Strayer & Haig, The Financing of Education in the State of New York, 1923). After the report of the Diefendorf Committee in 1962 (see NY Legis Doc, 1962, No. 10), the foundation grant program was abandoned in favor of a "shared-cost" program, which quickly deteriorated to another system of dispensing foundation grants because of the low expenditure ceilings set by the Legislature (see Coons, Clune & Sugarman, *op. cit.*, at pp 182-188). In 1972, The Fleischmann Report on the Quality, Cost and Financing of Elementary and Secondary Education in New York concluded that the existing system was hopeless and recommended full State assumption of fiscal costs. The report was followed by the *impanelment in 1973* of a Task Force on State Aid for Elementary and Secondary Schools, whose proposals resulted in further amendments to the State aid system (see L 1974, chs 241, 718). The determination of unconstitutionality under review here was followed by the creation of the New York State Special Task Force on Equity and Excellence in Education which has rendered two interim reports.

entitles each district to raise $1,650 per weighted pupil by imposition of an 11.57 mill tax on its full tax base with the State compensating for any deficiency. The second tier is keyed to the adjusted gross income (for income tax purposes) behind each pupil unit in the district. Under it a district with adjusted gross income of less than 125% of the State average of $29,700 will receive assistance to a theoretical maximum of $235 per pupil unit if the income is zero.[10] Although the 1981 legislation which related second tier assistance to personal wealth invoked a concept new to educational finance in New York, its total effect on the inequities in the system is insignificant due either to the height of income at which the formula commences its assistive function or the limited sums involved at the second tier level. Indeed, the 1981 adjustments to the operating aid formulas will result in plaintiff Levittown receiving an increase in operating aid of less than $29,000, or .21% more than it received in 1980-1981; a far wealthier district — Great Neck — fares better, however, receiving $24,000 more — a .71% increase over its previous year's aid. Whatever the tendency of the support figures in both tiers to equalize fiscal capacities of school districts, however, it has been partially offset by the statutory entitlement of every district to a flat grant of $360 per aidable pupil regardless of wealth.

Both the 1974 and 1981 formulas have further disequalizing aspects. School districts with diminishing pupil counts or sharp increases in property wealth can avoid unpleasant consequences to their State aid allotments by resorting to a "total save harmless" prescription which

---

10. The current formula for computing first tier operating aid is:

$$OA_1 = \$1,650 \left(1 - .51 \, \frac{\text{district valuation/total wealth pupil units}}{\$72,700}\right)$$

Thus, for the district of average wealth as of 1981 (that is, one in which district valuation/total wealth pupil units equals $72,700) State aid under the first tier is $1,650 $(1-[.51 \times 1]) = \$808.50$ (Education Law, § 3602, subd 1, par i [as amd by L 1981, ch 53, § 11], subd 3, par b [as added by L 1981, ch 53, § 17], subd 12, par b [as amd by L 1981, ch 53, § 24]).

The current formula for computing second tier operating aid is:

$$OA_2 = \$235 \left(1 - .80 \, \frac{\text{district adjusted gross income}}{\$29,700}\right)$$

Thus, the district which has an adjusted gross income equal to the State average as of 1981 (i.e., $29,700) received $47 per pupil unit ($235 $[1-(.80 \times 1)] = \$47$) (Education Law, § 3602, subd 1, par k [as added by L 1981, ch 53, § 13]; subd 3, par c [as added by L 1981, ch 53, § 17]; subd 12, par c [as amd by L 1981, ch 53, § 25]).

allows them to receive the same total State aid as in the prior year or — since 1980 — to receive "special aid" which gives them the same State assistance per pupil as was received in the prior year provided the increase does not exceed 8% per pupil or the total amount received in the previous year. The school districts which calculate State aid under these provisions receive assistance which maintains their parity with the past without accounting for their currently lessened needs. Approximately one third of the districts now utilize these formulas and some have had continuous resort to such save harmless methods of calculating assistance since 1965.

While additional State aid is provided for buildings, transportation, Boards of Cooperative Educational Services (BOCES) and various other programs, the formulas employed in computing transportation and BOCES aid are more beneficial to property rich districts than to those of low wealth. Indeed, one of the two alternative computations available in the BOCES formula provides a wealthy, high-spending district with recoupment of almost the same percentage of its approved expenses as a poor district.

The record demonstrates that the ability to expend sums for educational purposes and the quality of the educational services delivered are directly correlated with local real property wealth. In 1975, that wealth ranged from $412,370 per pupil on a weighted average daily attendance basis to $8,884 — a ratio of 46 to 1. When the extremes were eliminated, the variation at the ninetieth and the tenth percentiles of wealth was about 4 to 1. The existence of grossly unequal access to wealth within the same counties was evidenced by the more than $124,000 of value per pupil in the Nassau districts of Manhasset, North Shore and Great Neck as compared to $30,000 to $37,400 in Levittown, Roosevelt and North Merrick. Three Suffolk districts possessed per pupil wealth in excess of $370,000, while three of the less endowed had less than $27,000. By 1981, the same three highest Nassau County districts ranged from $197,000 to $176,000 in per pupil wealth while the same lowest ranged from $42,000 to $63,000; in Suffolk County, the three richest districts had per pupil wealth in excess of $432,000 while the three poorest had

less than $38,000. Trial evidence established that the number of children affected by wealth differentials was substantial. In 1974-1975 only 18% of the State's pupils resided in school districts whose real property wealth fell within 10% of the State average of $49,000 and more than half of the State's pupils lived in districts whose real property wealth was 25% above or below the State average.

The disparities in operating expenditures per pupil in 1974-1975 ranged from $4,215 for the richest district to $936 for the poorest, a ratio of 4.5 to 1. The district at the ninetieth percentile spent $2,051 per pupil compared to $1,089 spent at the tenth percentile, a ratio in excess of 1.9 to 1. Three districts in Suffolk spent more than $6,300 and four spent less than $2,300 while the ratios between some districts in Nassau and Albany Counties reached 2 to 1. The direct connection between wealth and operating expenses and total expenses is revealed by further statistics, a few of which bear mention here. For the 1975-1976 year, the 44 districts with less than $15,000 value per pupil spent an average of $1,789 while the 21 wealthiest districts (with $120,001 to $300,000 full value) averaged $3,744 per pupil. In 1977-1978, operating expenditures per pupil at the second decile of real estate wealth ($37,982) were $1,571 per pupil while in the ninth decile ($86,756) the per pupil expenditure was $2,203.

The consequences of these disparities are dramatic. Districts with full value of under $20,000 per pupil raised on the average only $276 per pupil while those with more than $60,000 raised $1,743. To achieve expenditure levels to provide better educational output, low-wealth districts must tax themselves at relatively high rates, as a result of which they encounter difficulties in obtaining school budget approvals, imposition of austerity budgets which limit transportation, supplies, library and textbook purchases, and, ultimately, rises in rates of mortgage foreclosure and community instability. With professional staff ratios one of the most important indicators of quality in educational programs, higher wealth districts have a higher ratio of professional staff to students and smaller class sizes; one study revealed a 40% greater density of classroom teachers

per 1,000 pupils in high-spending districts. Not only are the teachers employed by the wealthier school districts more numerous on a per classroom basis, but they generally possess superior experience and training. Low-wealth districts are unable to reduce class size and their children lose the resulting individual attention which is particularly important for both the disadvantaged and the gifted. Such districts are compelled to hire fewer nonteaching personnel as guidance counselors, psychologists and therapists and they cannot adequately provide the special attention requisite for students with severe speech and hearing impediments. Poor districts must ration their speech therapists and other ancillary services to such a degree that long waiting lists exist for these services. Also constrained by insufficient realty wealth are the offer of the number and variety of advanced placement programs (which encourage children to continue in school and provide better preparation for college), advanced courses in the sciences, adequate variety in language courses, programs in the arts and sufficient field trips, all of which are available to wealthier districts, often without greater tax effort. Finally, the low-wealth districts experience chronic shortages of equipment and supplies.

In property-poor districts, budgetary constraints limit local ability to provide desired educational output and minimize freedom of choice. The record reveals that low-wealth districts have little leeway in developing curricula beyond what is required as a State minimum. In Levittown, advanced mathematics, language courses and certain mechanical arts courses were discontinued, basic curriculum courses were reduced, industrial arts programs could not be offered, foreign language programs in junior high school could not be re-established, and conversational foreign language courses could not be introduced in its elementary schools — all as a consequence of lack of funds. In the Roosevelt school district, as in many others, extra-curricula programs requiring stipends, such as interscholastic sports and honor societies, were eliminated.

Fund shortages also affect district ability to engage necessary teaching and administrative personnel. At the time of trial, 9 of Brentwood's 12 elementary schools were

without assistant principals and the district was unable to follow the Education Department's recommendation for reducing class size in certain courses because it could not afford to hire the requisite additional staff. In Roosevelt, there were no funds for substitute teachers and 23 professional staff members had to be terminated in 1975-1976 to eliminate a budget deficit. In Burnt Hills — Balston Lake, budget cuts mandated a staff reduction of 25.9 positions, 14.9 of which were occupied by professionals.

### III

At the root of the intervenors' fiscal problems is municipal overburden — the inexorable drain on the tax base caused by the need to deliver more numerous and more costly noneducational services. The condition is unremedied by the State aid formula which ties reduced average daily attendance to realty resources and thereby overstates the cities' true ability to finance education. Burdened with higher expenditures for noneducation purposes than the surrounding counties and the rest of the State, the consequences to the cities are obvious — the four intervenors spent 28% of their tax revenues on education while jurisdictions outside the cities spent 45%, and on a per capita basis, with Federal and State aid netted out, New York City's nonschool spending was $401.06 while in the rest of the State the figure was $183.17.

The conditions which create municipal overburden include those to which the decline of central cities are customarily attributed, and we conclude they are inexorable. The intervenors are burdened with high concentrations of the poor and elderly, large numbers of public assistance and public health recipients, high unemployment and low educational attainment, high crime rates, professional rather than volunteer fire departments, costly correctional facilities, mass transit problems, higher park and recreation expenses, subsidization of public housing, higher construction costs for new schools, deterioration of infrastructure, plus a myriad of other noneducational costs mandated by State law in connection with city employees, such as the "heart bill", which was extended by the 1981 Legislature (L 1981, ch 381, § 6).

The severity of the problems is illuminated by the fact that, with 43% of the State's population, New York City had 70% of the State's public assistance recipients, who constituted 12½% of its residents as compared to 3.6% in the rest of the State. The city had 67% of the State's Medicaid claimants and spent $51 per capita in contrast to $15 in the rest of the State. The costs of public assistance and Medicaid are largely beyond local control because they are governed by State and national criteria.

Its huge concentration of poverty stricken gave New York City 47% of the State's pupils with special educational needs, although it had only 31% of the total public school population and received only 26% of the State's education operating aid. Despite changes in the aid prescriptions which have occurred since the trial, disproportionately low State aid to the cities continues. By 1980-1981 New York City's percentage of the State's special needs pupils had risen to 51% as against 33% of the public school enrollment and 29% of education operating aid. Apart from Buffalo, the intervenors still receive fewer tax dollars in State aid per pupil unit than does the average school district.

Another disequalizing assumption of the State-wide scheme is uniformity of the purchasing power of the education dollar. State mandated minimum education programs cost 47% more and average expenses were 29% higher in down-State and metropolitan areas than in up-State areas, matters further exacerbated by the higher cost of living in the large urban centers. The largest component of school expense — teacher salaries — were higher down-State and approximately 30% higher in urban areas than in the rest of the State.

The State's reliance on attendance rather than enrollment figures results in a double financial penalty to the cities because of their high rates of absenteeism. The State aid formula first calculates fiscal capability by dividing total real property valuation by total wealth pupil units, a number based upon average daily attendance, and at a subsequent point determines the aggregate aid by utilizing "total aidable pupil units" which is again predicated upon average daily attendance in the district. Since the average

daily attendance in the cities is lower by far than in the rest of the State, the formula artificially inflates the real property value behind each pupil. In 1974-1975, the average daily attendance of students in the city schools was 84% in contrast to almost 94% elsewhere in the State. With planning based on total enrollment and the concomitant need to render additional assistance to pupils who have fallen behind due to absence, the high number of absentees increases education costs in the cities while at the same time depriving them of needed succor. Because the high absentee rate is a direct consequence of poverty and underlying social conditions, its effects are inexorable and its financial effects cannot be alleviated by employment of additional attendance officers.

The significantly higher proportion of physically, mentally and emotionally handicapped and learning impaired pupils resident in the cities and the extra personnel required to administer necessary programs compel the expenditure of greater sums to educate them. While the State aid formula provides additional weightings for handicapped students, the computation is flawed by a failure to account for municipal overburden, reduced purchasing power of city educational dollars, and high absentee rates. The record shows that the formula deprived the intervenors of some $26,000,000 in State aid in 1974-1975.

Those who require special programs 60% or more of each school day exist in substantially higher numbers in the intervenors' schools than elsewhere. Reduced aid to the cities also impairs their abilities to instruct students who speak little or no English, although such programs are required under Federal mandate. While the 1980 formula grants additional weighting for disadvantaged pupils and certain categories of the handicapped in secondary schools, the failure to apply such weighting to all handicapped students in secondary schools denied the intervenors some $12,000,000 aid for the 1980-1981 year.

Finally, the cities have the highest concentration of occupational education students, but the "Special Services aid" formula which assists with occupation education is less favorable than the BOCES computation available elsewhere. Had the BOCES formula been available to the

intervenor cities in 1975, they would have received over $15,000,000 in additional aid, more than $12,000,000 additional for the 1980-1981 year, and $5.7 million more for 1981-1982. Because of their large numbers and the greater expense of the programs offered, city school districts are unable to accommodate all students requesting occupational education.

The 1981 amendment which tied the second tier of basic aid to adjusted gross income within the districts further discriminated against the cities because their income generally exceeds the State-wide average despite the huge masses of poverty stricken who reside within their boundaries. As a result, New York City — with 33% of the State's pupils — is entitled to only 27% of second tier aid, and despite unquestioned enrichment of the handicapped aid prescriptions to assist the cities in 1981, New York City still will receive total aid in the area of 29% of the State's total while supplying one third of the pupil body and while still afflicted with the problems we have surveyed.

The results of national, State and local achievement tests demonstrate that unconscionable numbers of children fail to acquire basic educational skills. In Rochester, standardized tests given in 1975 revealed that 45% of the secondary school students were "educationally disadvantaged" — that is, not performing at grade level and at least two years or more below level in reading — as were 58% of those students in mathematics; 16% of Rochester's twelfth grade students read fifth grade level or below. In a 1976 New York City test, 12% of the ninth grade students were found to read at fourth grade level or below. Of these, 7% scored at a third grade level or below, and 4% scored at a second grade level or below. Other cities have similarly depressing levels of underachieving pupils. In one New York City school, 70% of the ninth graders tested were two or more years below grade level and one fourth were at fourth grade level or below. These percentages translate into many thousands of high school children, some of whom are totally illiterate while others can read the words without accompanying comprehension and still others cannot apply the meager information they can obtain to problems. In both reading and mathematics in all grades, the four

cities have far larger percentages of students in the bottom of three stanines of the Pupil Evaluation Program. We have been directed to no sources which would suggest any significant improvement in these dismal statistics in recent years.

The gross educational underachievement evidenced by these and other findings is compounded as the child progresses through school because the sequential format of the curriculum builds upon skills assumed to have been acquired earlier. Despite this phenomenon, however, educational experts testified that underachievement or failure could be ameliorated or overcome entirely by the implementation of various remedial programs, some of which had been conducted in their cities. Such programs can be implemented only at a substantial cost, and the reduced aggregate State aid precludes the cities from establishing the programs for all those who would benefit from them, and in fact, results in curtailment of existing programs. Trial Term's summary of the situation is apt: "When the cities concentrate resources on pupils with special needs, other pupils, including those who are in fact disadvantaged but not reached by special programs, are subjected to educational deprivation. As concerns educational offerings the city schools have been shown to have among the highest teacher-pupil ratios in the State and a severely constricted variety of elective courses. Many pupils attend classes in buildings which were shown to be in need of repairs and lacking in facilities for counseling, study or recreation. Pupils attending schools in the large cities were shown to be provided with less physical security in their schools; less transportation; restricted sports and extracurricular activity; inadequate library and health services and diminished offerings in art and music. In summary, the failure to provide State aid on an equitable basis deprived the children in the large city districts of an equal education opportunity." *(Board of Educ. v Nyquist,* 94 Misc 2d 466, 518-519, *supra.)*

IV

■ Two of defendants' threshold contentions — both fastening upon aspects of justiciability (see *Jones v Beame,*

45 NY2d 402; *Matter of Dairylea Coop. v Walkley*, 38 NY2d 6) — merit summary dispatch. The various boards of education have standing to make the current challenge (see *Board of Educ. v Allen*, 20 NY2d 109, affd 392 US 236), and, in view of the "expanding scope of standing" *(Matter of Fritz v Huntington Hosp.*, 39 NY2d 339, 345), the school children represented by their parents have similar status (see *Boryszewski v Brydges*, 37 NY2d 361).

Nor is there substance to the second assault upon justiciability. Averring that the controversy is unsusceptible of judicial resolution, the defendants proclaim that adjudication of issues relative to the fiscal structure of the educational system will usurp legislative functions. But the court need not reorder fiscal priorities (see *Jones v Beame, supra)* or interject itself into the day-to-day administration of the school system or educational policy (see *James v Board of Educ.*, 42 NY2d 357) to entertain this action. The question here is whether the State's chosen method for allocating resources to meet the constitutional imperative of educating children comports with the Federal and State Constitutions. We know of no sister State which has refused merits treatment to such issues, and we would regard our own refusal to adjudicate plaintiffs' claims of constitutional infringement an abdication of our constitutional duties. We turn, then, to the merits of the action.

V

Equal protection doctrine has two major concerns: the nature of the discrimination, that is, the division of people into classes for the purpose of differential application of the law, and the nature of the benefits or burdens involved.[11] The first step in analysis of a claim of deprivation of equal protection is selection of the measure of scrutiny to be applied. The traditional choice is between two alternatives — a "strict scrutiny" which is "usually fatal" in effect,[12]

11. Levin, The Courts, Congress, and Educational Adequacy: The Equal Protection Predicament, 39 Md L Rev 187.

12. Gunther, The Supreme Court 1971 Term- Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv L Rev 1, 8. Writing in 1973, one commentator noted that since 1944 no classification to which strict scrutiny had been applied survived (see Richards, Equal Opportunity and School Financing: Towards a Moral Theory of Constitutional Adjudication, 41 U of Chi L Rev 32).

and "rational basis" review which has been characterized as "deferential"[13] and "toothless"[14] and under which the challenged classification generally survives.

Strict scrutiny is the test when the challenge involves suspect classifications such as race,[15] national origin[16] and alienage,[17] or classifications which impinge upon a "fundamental interest" such as voting,[18] travel,[19] procreation,[20] criminal appeals,[21] or First Amendment rights.[22] When the court invokes strict scrutiny review, the government must prove the exactitude of the relationship between the means chosen and the legislative end to be served[23] and establish that the end is justified by a "compelling state interest".[24] But where the classification is not suspect and no fundamental interest has been infringed, rational basis review is required; those who challenge the legislation must show that the classification had no rational relationship to a legitimate legislative end *(Vance v Bradley,* 440 US 93; *Village of Belle Terre v Boraas,* 416 US 1; *Dandridge v Williams,* 397 US 471). Since they rarely succeed, it is obvious that under the "two-tier" approach the litigation is almost always determined by the method of review selected. In *San Antonio School Dist. v Rodriguez* (411 US 1, *supra),* the Supreme Court found wealth nonsuspect, education nonfundamental, and chose rational basis as the test. The Texas educational finance scheme survived.

13. *Craig v Boren,* 429 US 190, 210-211, n * [POWELL, J., concurring].

14. See *Trimble v Gordon,* 430 US 762, 767; *Matter of Lalli,* 43 NY2d 65, 67, affd *sub nom. Lalli v Lalli,* 439 US 259.

15. *Loving v Virginia,* 388 US 1; *McLaughlin v Florida,* 379 US 184; *Korematsu v United States,* 323 US 214.

16. *Castaneda v Partida,* 430 US 482; *Hernandez v Texas,* 347 US 475; cf. *Takahashi v Fish & Game Comm.,* 334 US 410.

17. *Nyquist v Mauclet,* 432 US 1; *Examining Bd. v Flores de Otero,* 426 US 572; *Sugarman v Dougall,* 413 US 634; *Matter of Griffiths,* 413 US 717; *Graham v Richardson,* 403 US 365; cf. *Ambach v Norwick,* 441 US 68; *Foley v Connelie,* 435 US 291.

18. *Dunn v Blumstein,* 405 US 330; *Kramer v Union School Dist.,* 395 US 621; *Harper v Virginia Bd. of Elections,* 383 US 663; *Reynolds v Sims,* 377 US 533.

19. *Memorial Hosp. v Maricopa County,* 415 US 250; *Dunn v Blumstein,* 405 US 330; *Shapiro v Thompson,* 394 US 618.

20. *Skinner v Oklahoma,* 316 US 535.

21. *Griffin v Illinois,* 351 US 12.

22. *Carey v Brown,* 447 US 455; *Police Dept. of Chicago v Mosley,* 408 US 92.

23. See, e.g., *Carey v Brown, supra; Police Dept. of Chicago v Mosley, supra.*

24. *Matter of Griffiths,* 413 US 717.

The exclusivity of this "rigidified" *(San Antonio School Dist. v Rodriguez,* 411 US, at p 98) two-tier system was overtly challenged when the existence of yet a third test was posited by Justice MARSHALL in his *Rodriguez* dissent *(supra,* p 70). Citing to a number of earlier determinations,[25] Justice MARSHALL concluded that the court had consistently adjusted the care with which it had reviewed statutory classifications in light of "the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn." (411 US, at p 99.)

While the Supreme Court has never expressly abandoned the theory of two-tier review, it is apparent that where the classifications involved or the interests invaded have appropriate standing, the rational basis standard takes on a "sharper focus" *(Craig v Boren,* 429 US 190, 210-211, n [POWELL, J., concurring]) which is sometimes described as "heightened" or "intermediate" scrutiny *(Rostker v Goldberg,* 453 US __, __, 49 USLW 4798, 4801; *Wengler v Druggists Mut. Ins. Co.,* 446 US 142; see, generally, Tribe, American Constitutional Law, § 16-30; Gunther, Constitutional Law, Cases and Materials [10th ed], ch 10). Indeed, the Supreme Court has invoked a "range"[26] of intermediate approaches to semi-suspect or sensitive classifications premised upon characteristics such as gender (e.g., *Rostker v Goldberg, supra; Kirchberg v Feenstra,* 450 US 455; *Wengler v Druggists Mut. Ins. Co., supra; Califano v Westcott,* 443 US 76; *Caban v Mohammed,* 441 US 380; *Orr v Orr,* 440 US 268; cf. *Frontiero v Richardson,* 411 US 677 [plurality applying strict scrutiny]) or illegitimacy (e.g., *Trimble v Gordon,* 430 US 762; *Matthews v Lucas,* 427 US 495; *Weber v Aetna Cas. & Sur. Co.,* 406 US 164; *Levy v Louisiana,* 391 US 68; cf. *Lalli v Lalli,* 439 US 259) and to classifications which infringe on important, although not constitutionally "fundamental" or "preferred" interests, such as the benefit of continued receipt of food stamps *(United States Dept. of Agric. v Murry,* 413 US 508; cf. *United States Dept. of Agric. v*

---

25. *James v Strange,* 407 US 128; *Weber v Aetna Cas. & Sur. Co.,* 406 US 164; *Eisenstadt v Baird,* 405 US 438; *Reed v Reed,* 404 US 71.

26. Tribe, American Constitutional Law, p 1092.

*Moreno,* 413 US 528 [explicit equal protection]), affordable college tuition *(Vlandis v Kline,* 412 US 441), retention of a driver's license *(Bell v Burson,* 402 US 535), employment in the Federal civil service *(Hampton v Mow Sun Wong,* 426 US 88), a father's interest in custody of his child *(Stanley v Illinois,* 405 US 645) or a child's interest in obtaining certain Social Security benefits *(Jimenez v Weinberger,* 417 US 628).

Although the "important interest" cases noted were decided on due process principles, they have been recognized as "conceptually equivalent to an equal protection challenge" to the pertinent statutes (Phillips, Irrebuttable Presumptions: An Illusory Analysis, 27 Stanford L Rev 449, 450; Note, The Irrebuttable Presumption Doctrine in the Supreme Court, 87 Harv L Rev 1534, 1555-1556; Tribe, American Constitutional Law, § 16-31, p 1090, n 10; see *Cleveland Bd. of Educ. v LaFleur,* 414 US 632, 652 [POWELL, J., concurring]), and the heightened scrutiny invoked is explainable on the basis of the importance of the interests to the affected individuals. There seems little doubt that the Supreme Court employs an elevated level of review when it deems the interests involved to be of sufficient importance (see Note, 27 Stanford L Rev 449, 460; Note, 87 Harv L Rev 1534, 1550; Tribe, American Constitutional Law, § 16-31, p 1090), particularly when legislative and administrative processes seem systemically resistant to change *(id.,* p 1092).

The critical differences between the rational basis standard and heightened or intermediate scrutiny are readily visible. Under the rational basis test, challenged legislation will survive if it furthers a merely "legitimate" State interest and if any state of facts can be rationally conceived — even by the court itself — to support the classification (see *Western & So. Ins. Co. v State Bd. of Equalization,* 451 US 648; *McGowan v Maryland,* 366 US 420; *Williamson v Lee Opt. Co.,* 348 US 483; *Railway Express v New York,* 336 US 106).

But under the intermediate approaches, the challenged classification must serve "important", rather than merely "legitimate", government objectives and it must "substantially" further their achievement (see *Craig v Boren,* 429

US 190, 197, *supra);* it will not suffice that the classification rationally could be conceived as furthering the end. Furthermore, the rationale for the classification must be articulated by its defenders and must have been a motivating rationale for the law, rather than one supplied by afterthought (see Tribe, American Constitutional Law, § 16-30, pp 1083-1085; Gunther, The Supreme Court 1971 Term- Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv L Rev 1, 28, 35, 44-47). Even if an "important" objective is "substantially" served, however, it must be established that a less intrusive alternative could not accomplish the same purpose (see *Orr v Orr,* 440 US 268, 279, *supra; Craig v Boren, supra,* p 197; *Matthews v Lucas,* 427 US 495, 513, *supra; Jimenez v Weinberger,* 417 US 628, 636, *supra; Trimble v Gordon,* 430 US 762, 772, n 14, *supra; Alevy v Downstate Med. Center of State of N. Y.,* 39 NY2d 326, 336). Finally, and quite significantly, the party defending the classification has the burden of demonstrating both the importance of the governmental purpose to be served and the substantial relationship between chosen means and articulated end (see *Wengler v Druggists Mut. Ins. Co.,* 446 US 142, 151, *supra; Caban v Mohammed,* 441 US 380, 393, *supra; Craig v Boren, supra,* p 204).

In New York there is forthright recognition that circumstances exist "where the right sought to be vindicated might be found to call for a test somewhere along the sliding scale between strict scrutiny at one end and rational basis at the other" (see *Montgomery v Daniels,* 38 NY2d 41, 61) and such an intermediate standard was applied when the Court of Appeals decided the reverse discrimination issue in *Alevy v Downstate Med. Center of State of N. Y.* (39 NY2d 326, *supra).* Writing for the *Alevy* court, Judge GABRIELLI rejected the "polarized and outcome-determinative" (39 NY2d, at p 333) traditional equal protection tests and applied an intermediate scrutiny formula. Two subsequent illegitimacy cases (see *Matter of Lalli,* 43 NY2d 65, affd *sub nom. Lalli v Lalli,* 439 US 259; *Matter of Fay,* 44 NY2d 137, app dsmd *sub nom. Buck v Hunter,* 439 US 1059) also became the subject of the intermediate test. In this State, equal protection analysis

is not bound to a formula that contains two extremes but no middle.

## VI

We are precluded from applying strict scrutiny in the instant case because the State's highest court has twice cited *Rodriguez* (411 US 1, *supra)* in support of statements that education is not a fundamental right (see *Alevy v Downstate Med. Center of State of N. Y., supra,* pp 332-333; *Matter of Levy,* 38 NY2d 653, 658, app dsmd 429 US 805, reh den 429 US 966). Aware that the doctrine of *stare decisis* binds us to follow the holdings of courts higher than our own, the original plaintiffs argue that *Levy* is distinguishable, *Alevy* is not applicable, and the references to educational nonfundamentality in both cases are not binding here. While it may be crucially significant that *Rodriguez* premised its conclusion of nonfundamentality on the view that the United States Constitution does not explicitly or implicitly guarantee education — and New York's Constitution does — we see no intellectually defensible method of holding education fundamental in the face of apparently contrary statements from the Court of Appeals, and we will not seek to downplay their significance (see *Gimble Bros. v White,* 256 App Div 439; *People v Cascia,* 191 App Div 376; *United States v DiFrancesco,* 604 F2d 769, revd 449 US 117; *United States v Bell,* 524 F2d 202). Therefore, while State courts have the right to give broader sweep to State constitutional guarantees than the Supreme Court provides for similar Federal guarantees *(Minnesota v Clover Leaf Creamery Co.,* 449 US 456, 461, n 6; *Oregon v Hass,* 420 US 714, 719; *People v Barber,* 289 NY 378, 384) and both California (see *Serrano v Priest* [II], 18 Cal 3d 728, *supra)* and Connecticut (see *Horton v Meskill,* 172 Conn 615, *supra)* have found education fundamental under their Constitutions, the ultimate message on fundamentality in this State must emanate from the Court of Appeals. Nor would it be proper, at our level of appellate review, to emulate the approach the California Supreme Court took following *Rodriguez* (see *Serrano v Priest* [II], *supra)* and seek potential escape from the bar of nonfun-

damentality by determining whether school district wealth is a suspect classification under the New York Constitution.

With strict scrutiny barred, invocation of intermediate or intensified review depends on the importance of the interest or right allegedly invaded. None would dispute that education "fulfill[s] 'a most fundamental obligation of government to its constituency'" *(Ambach v Norwick,* 441 US 68, 74, quoting *Foley v Connelie,* 435 US 291, 297) and that it is "perhaps the most important function of state and local governments" *(Brown v Board of Educ.,* 347 US 483, 493; see, also, *Ambach v Norwick, supra; San Antonio School Dist. v Rodriguez,* 411 US 1, 29, *supra; Wisconsin v Yoder,* 406 US 205, 213; *Adler v Board of Educ.,* 342 US 485, 493; *Pierce v Society of Sisters,* 268 US 510; *Meyer v Nebraska,* 262 US 390). Its position as a primary obligation of this State was noted by the committee which drafted the opening section of the education article of the State Constitution in 1894: "There seems to be no principle upon which the people of this commonwealth are so united and agreed as this, that the first great duty of the State is to protect and foster its educational interests." (Report of the Committee on Education and the Funds Pertaining Thereto, 2 Documents of Constitutional Convention of State of NY, 1894, Doc No. 62, p 3.)

While it may be a matter of wonder as to who might argue that education is not important, the question we treat is of constitutional and not merely societal import. In both respects, Chief Justice WARREN's words of 27 years ago are relevant: "[Education] is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *(Brown v Board of Educ.,* 347 US 483, 493, *supra,*

quoted in *San Antonio School Dist. v Rodriguez,* 411 US 1, 30, *supra.)*[27]

Although the *Rodriguez* conclusion of no guarantee of equal educational opportunity has reduced *Brown's* sweep to that of racial discrimination, none can doubt that we deal here with obligations and rights which lie at the philosophic roots of the national fabric, which in the prior century became a direct command of our State Constitution, reinforced by compulsory attendance laws and annually supported by the State's greatest single financial exertion.[28] If institutional stability requires that we find the right to education not constitutionally fundamental in New York, we suspect there could be little disagreement with the view that the right represents an important constitutional interest. In this regard, we reject as misplaced the State's reliance on *Dorsey v Stuyvesant Town Corp.* (299 NY 512, cert den 339 US 981) for the proposition that *Rodriguez* (411 US 1, *supra)* compels application of the "rational relationship" standard of equal protection review. It is true that *Dorsey* posited the proposition that this State's equal protection guarantee (NY Const, art I, § 11) "is no more broad in coverage" than its Federal counterpart (299 NY, at p 530). But *Rodriguez* found that there was no implicit or explicit Federal guarantee of education as a matter of Federal constitutional jurisprudence. New York has its own constitutional mandate for education, and after independently canvassing our own constitutional scheme to gauge the degree of scrutiny to be applied to this case, we conclude that if our constitutional gaze cannot be strict, it must be as intense as intermediate analysis permits.

---

**27.** The demand for equality of educational opportunity has a much earlier derivation than the postwar civil rights struggle. In their 1923 report, Strayer and Haig (see n 9) wrote (p 173): "There exists today and has existed for many years a movement which has come to be known as the 'equalization of educational opportunity' or the 'equalization of school support.'" A *New York Times* editorial of January 24, 1923 advocated "such legislation as would assure the country child educational advantages in every corner of the state comparable with those of the city child, and at the same time equalize the educational burden so far as that could be done." It is obvious that the *Times* was writing for a different era.

**28.** The total general fund budget adopted by the State for 1980-1981 was $15,182,000,000 which included $186,000,000 in Federal revenue sharing funds. The total amount appropriated for education was $4,463,659,000, which represented 29% of the budget (NYS Budget Summary, 1981-1982, pp 45, 47). The amount raised locally for education was even higher.

Once it has been demonstrated that an important interest has been infringed, the first prong of intensified — though less than strict — equal protection review mandates inquiry as to whether the challenged classification substantially furthers the important governmental purpose the State articulates to defend it. If the State meets that test, it still must show under the second prong that the objectives advanced by the classification cannot be achieved by a less intrusive alternative.

Here, the disputed classification makes education a function of wealth and permits invidious disparities in education and educational opportunity between school children on the basis of the property wealth of the school districts in which they reside. Trial Term *(Board of Educ. v Nyquist,* 94 Misc 2d 466, 523, *supra)* identified education and equality of educational opportunity as the "state * * * interests which the statutory plan is designed to satisfy" and found them unsatisfied. But the justification the State actually offered for the statutory scheme was preservation of local control. Intermediate scrutiny requires consideration of the important interest which the State — and not the court — articulates to defend a classification *(Alevy v Downstate Med. Center of State of N. Y.,* 39 NY2d 326, 336, *supra;* see Gunther, The Supreme Court 1971 Term- Foreword, 86 Harv L Rev 1, 35, 47; Tribe, American Constitutional Law, § 16-30, pp 1083-1085). The important interest proffered in this case is preservation of local control. Not only is that interest important (see *Dayton Bd. of Educ. v Brinkman,* 433 US 406, 410), but we view it as supplying an appropriate motivating rationale for structuring the educational scheme around separate school districts.

We balance, then, the extensive evidence of disparity and discrimination against the justification the State offers — that the present method of financing education preserves local autonomy. We find that the State has not sustained its burden of proof. In school districts containing a large percentage of the State's school children, the current wealth-based system severely constrains the ability of school boards and administrators to provide the personnel services, curricula and even the equipment to furnish the educational offerings they deem suitable for their pupils.

The freedom to choose and deliver desired educational output is so inextricably and demonstrably linked to the degree of property wealth behind each pupil that meaningful local independence is largely reserved for areas with the real estate resources to exercise it. Local school districts cannot choose to have the best education by imposing the highest tax rate. Instead, the quality of the educational opportunity offered by any particular district is largely determined by the amount of taxable property in the district.[29] For the property poor, local control of education is more illusory than real, for it cannot be utilized to produce the educational output local authorities preceive as appropriate but only what a limited local tax base will permit. Since "[a] general policy of local control affords no real justification for maintaining a school finance ghetto" (Carrington, Financing the American Dream: Equality and School Taxes, 73 Col L Rev 1227, 1259), we reject the defendants' contention that local independence of choice is furthered by the fiscal scheme by which education is currently funded.

Furthermore, if some other process of reasoning could lead us to the conclusion that local educational independence is preserved rather than eroded by the present system, we would still be impelled to decide that the end can be accomplished by financial means which do not foster a discriminatory educational system pitched toward wealth and strongly favoring children whose good fortune it is to have affluent parents or neighbors and therefore to be endowed with educational opportunities unavailable to many of their peers. Although we neither suggest nor indorse any of the numerous proposals for educational finance reform offered by various of the trial witnesses,[30] interested agencies,[31] and other educational experts and

---

29. See *San Antonio School Dist. v Rodriguez*, 411 US 1, 128 [MARSHALL, J., dissenting].

30. These include Professor Walter I. Garms of the University of Rochester; Professor Donna Shalala of Columbia University; Dr. Joel S. Berke, Director of the Education Policy Research Institute of the Educational Testing Service; John J. Callahan, Past Director, School Finance Project for the National Conference of State Legislatures, Washington, D. C.

31. Research Findings and Policy Alternatives: A Second Interim Report of the New York State Special Task Force on Equity and Excellence in Education, Sept., 1980; The Fleischmann Report, n 9.

commentators,[32] we have no doubt that, when finally confronted with the constitutional invalidity of the current finance structure, the legislative bodies which were successful in establishing one of the Nation's finest systems of higher education can produce solutions that will provide equitable sustenance to permit our educational localities to exert the requisite efforts and make the independent judgments to create educational outputs which they deem suitable to local need. A fiscal scheme which affords a constitutional degree of equality of educational opportunity need not be inconsistent with local freedom of choice.

Having thus determined that the current educational finance system is discriminatory and that it cannot survive a heightened level of State constitutional scrutiny, we nevertheless depart from the trial court's determination that the Fourteenth Amendment has been transgressed. Relying on certain dicta in the *Rodriguez* opinion (411 US 1, *supra),* the able Trial Justice concluded that the evidence warranted his finding a violation of the Fourteenth Amendment. In the course of concluding that the Constitution does not guarantee the right to education, the *Rodriguez* court observed (p 36) that "[e]ven if it were conceded that some identifiable quantum of education" was a constitutionally protected prerequisite of the exercise of First Amendment or electoral franchise rights — both of which the Constitution does guarantee — there was no evidence of such deprivation in the case before it. Although we do have evidence that significant numbers of New York pu-

32. See, e.g., Coons, Clune & Sugarman, Private Wealth and Public Education; Burke, "A Dynamic Finance Policy", Financing the Changing School Program, Proceeding of the Fifth National School Finance Conference, pp 83-84; Burrup, Financing Education in a Climate of Change [2d ed], pp 262-274; Jones, Financing Public Elementary and Secondary Education, pp 28-84; Lindman, "The Conant Plan — Shall the States Take Over the Financing of Schools?", The School Administrator (Wash. D. C., Feb., 1970); Mort, Reusser & Polley, Public School Finance: Its Background, Structure, and Operation [3d ed], pp 255-285; Andersen, School Finance Litigation — The Styles of Judicial Intervention, 55 Wash L Rev 137; Carrington, Financing the American Dream: Equality and School Taxes, 73 Col L Rev 1227; Chin, An Analysis and Review of School Financing Reform, 44 Fordham L Rev 773; Grubb, The First Round of Legislative Reforms in the Post-*Serrano* World, 38 Law and Contemporary Problems 459; Silard & Goldstein, Toward the Abolition of Local Funding in Public Education, 3 Journal of Law and Education 307; Thomas, Equalizing Educational Opportunity Through School Finance Reform: A Review Assessment, 48 U of Cin L Rev 255; Zelinsky, Educational Equalization and Suburban Sprawl: Subsidizing the Suburbs Through School Finance Reform, 71 NW U L Rev 161.

pils are deprived of the basic educational minimums required by the education article of the State Constitution, neither the *Rodriguez* dictum (which left the "quantum of education" question totally obscure) nor the Supreme Court's holding in *Lau v Nichols* (414 US 563) provides any basis for us to declare that, on this record, New York has deprived its young people of First Amendment and electoral franchise rights to such an extent that the Fourteenth Amendment is violated. *Lau* dealt with a violation of the 1964 Civil Rights Law and not the Fourteenth Amendment, and even if the *Rodriguez* dictum is to be construed as mandating some educational minimum for the exercise of First Amendment and electoral rights, we know not what it is. There is no foundation, then, for a current declaration that New York's educational funding structure contravenes the Fourteenth Amendment. It suffices that plaintiffs' guarantee of equal protection of the law under section 11 of article I of the State Constitution has been invaded.

Finally, it is necessary to deal with Justice HOPKINS' critique of the legal methodology and factual underpinnings of our equal protection holding. With typically consummate skill, our colleague has expressed the reasons which deter him from concluding that the equal protection clause of the State Constitution has been violated. We cannot agree, however, that the *Rodriguez* case determined New York's equal protection questions any more than it did those of California (see *Serrano v Priest* [II], 18 Cal 3d 728, 766-767, *supra),* or Connecticut (see *Horton v Meskill,* 172 Conn 615, 640-641, *supra).* Our colleague's reliance is on Justice POWELL's assertion that the *Rodriguez* record lacked proof of absolute deprivation of education or of a definable suspect class of poor people — the latter because both poor and nonpoor might reside in some of the property-poor school districts. But that reference by the *Rodriguez* majority addressed the measure of scrutiny to be employed in determining the Federal equal protection issues *(San Antonio School Dist. v Rodriguez,* 411 US 1, 19, 23-24, *supra)* and not the ultimate merits of the equal protection claims. As we have previously noted, New York's Constitution explicitly guarantees education, and if

that right is not fundamental, the significance of its substance in our constitutional scheme cannot be gainsaid. Therefore, proof of absolute educational deprivation, which might impinge upon other fundamental rights guaranteed by the Federal Constitution, simply is not a prerequisite of intermediate scrutiny of the constitutionally important interest of education under our State Constitution.

Nor can we concur that plaintiffs' proof (in its ultimate effect) circumstantially suggests nothing more than the existence of lower ratios of teachers to staff and the other inequalities in staffing. We believe there is an overwhelming mass of direct proof — reflected in our findings — of the existence of severe inequities in the educational system based on differences in district property wealth. There also is a virtual plethora of evidence, direct and circumstantial, that the levels of education available in the poorer areas are significantly reduced. What is determinative of the equal protection issues before us is not whether there is absolute deprivation of educational minimums, but whether the palpable proof of clearly lesser educational opportunity based on wealth discrimination establishes violation of the equal protection provision of the State Constitution. We think it does.[33]

In reaching our conclusion of equal protection violation, we are not oblivious to Justice HOPKINS' concern with the prospect of litigative reverberations upon other areas of State function. In our view, however, there can be no justification for overlooking a violation of the equal protec-

---

33. Justice HOPKINS has quoted Private Wealth and Public Education (see n 2) relative to the "inadequacy of social science to delineate with any clarity the relation between cost and quality." The quoted volume espoused the doctrine of "fiscal neutrality" and is often credited with providing much of the intellectual impetus for educational finance reform (see, e.g., Thomas, Equalizing Educational Opportunity Through School Finance Reform: A Review Assessment, 48 U of Cin L Rev 255; Tractenberg, Reforming School Finance Through State Constitutions: Robinson v Cahill Points the Way, 27 Rutgers L Rev 365; Zelinsky, Educational Equalization and Suburban Sprawl: Subsidizing the Suburbs Through School Finance Reform, 71 NW U L Rev 161). Although we believe the current record graphically demonstrates the differences in quality of education based on cost, we note that the quotation relied on by Justice HOPKINS continues with the following: "We regard the fierce resistance by rich districts to reform as adequate testimony to the relevance of money. Whatever it is that money may be thought to contribute to the education of children, that commodity is something highly prized by those who enjoy the greatest measure of it. If money is inadequate to improve education, the residents of poor districts should at least have an equal opportunity to be disappointed by its failure." (Coons, Clune & Sugarman, Private Wealth and Public Education, p 30.)

tion clause of the State Constitution on the ground that additional litigation may ensue in other areas of governmental concern (see *Serrano v Priest* [I], 5 Cal 3d 584, 613-614, *supra)*. Furthermore, in terms of equal protection, education has qualities of constitutional uniqueness because it has not been delegated to municipal or local government; rather, it is a "State function to be kept separate and apart from all other local or municipal functions" *(Lanza v Wagner,* 11 NY2d 317, 326, app dsmd 371 US 74; NY Const, art IX, § 3, subd [a], par [1]; see *Matter of Board of Educ. v City of New York,* 41 NY2d 535; *Matter of Divisich v Marshall,* 281 NY 170; *People ex rel. Wells & Newton Co. v Craig,* 232 NY 125; *Matter of Emerson v Buck,* 230 NY 380; *Gunnison v Board of Educ.,* 176 NY 11).

We also disagree with our colleague's conclusion that the plaintiffs' municipal overburden argument is flawed because this court lacks the power to decide whether there has been a fair division of municipal resources as between various services. As Justice WEINSTEIN notes in his eloquent concurrence, we believe that the record presents compelling proof that problems of the central cities are deep seated and inexorable and that the resulting lack of educational funds is not a mere consequence of lack of wisdom in allocating municipal resources.

Ultimately, then, we cannot accept the contention that the profound inequities reflected in our factual findings are beyond the reach of judicial remedy even though required reform has been systemically resisted by the bodies empowered to deal directly with the problem.[34]

## VII

The final issue concerns the claim that the education article of the State Constitution is violated by an educational finance system which creates vast interdistrict variances in educational quality and from which many city children seem to receive precious little in the way of preparation for the future. The mandate of the education

---

34. We view *Lombardi v Nyquist* (63 AD2d 1058, mot for lv to app den 45 NY2d 710), cited in the opinion of Justice HOPKINS, as hinging upon a failure of petitioner's proof, rendering any discussion of the equal protection question dictum. Furthermore, we draw no conclusion from the Court of Appeals denial of review (see *Matter of Dobbs Ferry Union Free School Dist. [Dobbs Ferry United Teachers],* 51 NY2d 861).

article to maintain and support a school system in which all the children may be educated is brief, and its reference to education is devoid of semantic adornments such as "thorough and efficient",[35] "efficient",[36] "ample",[37] or "uniform"[38] which are found in the Constitutions of some of our sister States. Drawing on "thorough and efficient", the New Jersey Supreme Court struck down the State's educational finance structure by concluding that the 1875 amendments which delegated taxing power to local districts had equal educational opportunity for children "precisely in mind", for a "'thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years'" could have no other import (*Robinson v Cahill,* 62 NJ 473, 513, *supra*). The Washington State Supreme Court tied its holding of unconstitutionality to an article which declared it was the "paramount duty" of the State to make "ample provision" for the education of all the children (*Seattle School Dist. No. 1 v Washington,* 90 Wn 2d 476, 495). Unless it is to be argued that New York's education article is without parameters, we must conclude that, under its unembellished education article, the State must provide its children at least as much as what others must furnish pursuant to constitutional directives such as "thorough and efficient", or "ample".

In adopting the education article in the 1894 Constitution, the State electorate mandated the maintenance of a system of schools in which all the children of the State could be equipped with certain basic educational skills necessary to function effectively in society. As the committee which drafted the article stated in its report: "The public problems confronting the rising generation will demand accurate knowledge and the highest development

---

**35.** See Md Const, art VIII, § 1; Minn Const, art XIII, § 1; NJ Const, art VIII, § 4, par 1; Ohio Const, art VI, § 2; Pa Const, art III, § 14; SD Const, art VIII, § 15; W Va Const, art XII, § 1; Wyo Const, art VII, § 9.

**36.** See Del Const, art X, § 1; Ill Const, art X, § 1; Ky Const, § 183; Tex Const, art VII, § 1.

**37.** See Wash Const, art IX, § 2.

**38.** See Ariz Const, art XI, § 1; Col Const, art IX, § 2; Fla Const, art IX, § 1; Idaho Const, art IX, § 1; Ind Const, art 8, § 1; Minn Const, art XIII, § 1; Nev Const, art XI, § 2; NM Const, art XII, § 1; NC Const, art IX, § 2, subd [1]; ND Const, art VIII, § 4; Ore Const, art VIII, § 3; SD Const, art VIII, § 1; Utah Const, art X, § 1; Wash Const, art IX, § 2; Wyo Const, art VII, § 1.

of reasoning power * * * must be permanent, broad, and firm if the superstructure is to be of real value." (Quoted in 3 Lincoln, Constitutional History of New York, at p 555.)

This declaration of policy and intent, however, does not crystallize the basic educational skills required in 1894 as the prototype for the skills necessary to function in today's society. Rather, the intent of the drafters was to accommodate a system of free public schools which would produce individuals capable of dealing with the problems facing their own generation. The absence of adorning language in New York's education article does not reduce the State's duty to that of inculcating the minimal skills of reading, writing and arithmetic (see *Seattle School Dist. No. 1 v Washington,* 90 Wn 2d 476, 517, *supra).* Two States have found the basic education which falls within the ambit of their Constitutions as "[embracing] broad educational opportunities needed in the contemporary setting to equip our children for their role as citizens and as potential competitors in today's market as well as in the marketplace of ideas." *(Seattle School Dist. No. 1 v Washington, supra,* p 517; *Robinson v Cahill,* 62 NJ 473, 515, *supra;* see, also, *San Antonio School Dist. v Rodriguez,* 411 US 1, 37, *supra; Wisconsin v Yoder,* 406 US 205, 221, *supra.)* We believe section 1 of article XI of the New York Constitution requires no less.

In ascertaining the measure of education which our schools must be capable of affording their pupils, we are aided both by statute (see Education Law, § 3204, subd 3) and by regulations of the New York State Education Department (see 8 NYCRR 100.1 [a]-[e], promulgated under Education Law, § 207), which define the approved curricula for primary and secondary schools (8 NYCRR 100.1 [a]-[e]).[39] In determining whether the mere existence of these prescribed courses suffices to comport with the con-

---

39. The required course of study for the first eight years of full-time public day schools includes music, visual arts, arithmetic, reading, spelling, writing, English language, geography, United States history, civics, hygiene, physical training, the history of New York State and science (Education Law, § 3204, subd 3, as expanded by 8 NYCRR 100.1 [e]).

An approved high school course of study must include four units of English; three units of social studies, including one year of American history; one unit each of mathematics and science; one-half unit of health, and physical education. Additional free electives are necessary to complete the program (8 NYCRR 100.1 [a]-[c]).

stitutional command that the public schools be capable of providing an education for all children of the State, we cannot ignore the findings that thousands of children fail to acquire even minimal skills in reading, vocabulary and mathematics in lower grades and later underachieve or fail because they lack those skills; that thousands who pass through the school system can only decode words without comprehending them, cannot use graphs, maps or indexes, and cannot apply acquired knowledge — minimal as it may be — to solve problems; that thousands who attend high school read at a fifth grade level or below and some of these read at a third or even second grade level; and that some students leave the system wholly illiterate. The intervenor-plaintiffs, with 35.8% of the State public school enrollment in 1975-1976, had 52.4% of the State's pupils with special educational needs — defined as those scoring below minimum competency by State standards. In the urban centers, 25 to 35% more students than elsewhere score below minimum competency by standard measurements.

The failure to obtain an education, of course, is not necessarily reflective of a failure to the present school system to meet its constitutional obligation to make that education available. We harbor no illusion that all the failings in pupil achievement we have described flow from incompetence of the educational system, for we are aware of other deep-seated societal and familial failures which contribute in substantial degree to the problems of educating disadvantaged youth. Nevertheless, the record before us establishes that many of the children who fail to obtain minimal skills are educable and that properly staffed remedial programs, which afflicted school districts are prevented from providing because of fiscal constraints and misallocation of resources, do alleviate or totally remedy learning problems.[40] In sum, despite their disadvantaged background, many of those who leave New York's educational system uneducated could be provided with skills which would equip them for life's future demands.

40. The potentiality for effectiveness of such programs may be revealed by recent test results showing some reading improvement in two grades in the New York City schools (*New York Times,* Sept. 8, 1981, p B1, col 6).

■ In the face of evidence demonstrating that large numbers of children emerge from the school system lacking even the minimal tools necessary to function in society, and that the current financing scheme is in good measure a cause for the failures, we must conclude that the education article is violated by a method of financing which fails to establish a school system capable of providing an education for many educable children.[41]

Accordingly, the judgment should be modified (1) by deleting the three final sentences from decretal paragraph 1(a) and substituting the following: "The system presently impinges upon the important right of education guaranteed to all children of this State by section 1 of article XI of the New York Constitution in the plaintiff and intervenor-plaintiff school districts. The system fails to further the asserted State interest of preserving local control over education in these districts. It also fails because there are methods of financing public school education which would further local control over education with less intrusion upon the right of education guaranteed to all children of the State. Accordingly, New York's public school finance system violates the equal protection clause of the New York State Constitution (art I, § 11)"; (2) by deleting from the penultimate sentence of decretal paragraph 1(c) the words "and irrational"; and (3) by deleting from the final sentences of decretal paragraphs 1(c), 1(d) and 1(e) the words "and of the Federal Constitution (the Fourteenth Amendment)" and substituting the following declaration: "New York's school financing system is constitutional under the Fourteenth Amendment to the Constitution of the United States." As so modified, the judgment should be affirmed.

WEINSTEIN, J. (concurring). I concur in the opinion of Justice LAZER that the State system for financing public elementary and secondary schools violates the equal protection clause of the State Constitution and in the opinions of both Justices HOPKINS and LAZER that the subject legis-

41. Our determination should not be read to mean that the failure to obtain an education is a legally compensable wrong (cf. *Donohue v Copiague Union Free School Dist.,* 47 NY2d 440); rather, we conclude that the large numbers of educational failures presented in the record, which are potentially remediable, are evidence to warrant a finding that the system fails under the education article.

lation also violates the education article of the State Constitution. This concurring opinion will focus on the equal protection claims of the intervening school districts, especially New York City.

The State financial aid to education scheme awards less aid to school districts with higher than average property wealth and adjusted gross income and proportionately lower attendance rates on the assumption that such districts can more easily provide local funding for education. Although initially this appears reasonable and equitable, further consideration reveals that in fact the impoverished and minority children in the intervening large city school districts receive less aid for their education notwithstanding their greater needs because the education aid formula either omits entirely or takes insufficient account of the large cities' inexorable problems, their municipal and education overburdens, their lower attendance rates and the lower value of their educational dollar.

1.

The State education aid scheme has an inequitable impact on the children in the intervenors' schools. Urban children receive less aid for their education than do children in rural and suburban schools.

The problems which beset the cities are the subject of numerous findings and are admirably set forth in summary fashion in Justice LAZER's opinion. The conditions are familiar and include such intractable problems as crime, an aging physical plant and all the circumstances attendant upon a multiracial, multiethnic population, a large segment of which is impoverished, particularly in a port of entry. These widely publicized problems are not of the cities' making and the cost of coping with them is hardly a matter of choice. Indeed, the very survival of the cities may depend on the success of their efforts to overcome these problems. In addition, the cities are burdened with a number of noneducation costs which have been mandated by the State. Accordingly, the cities' higher noneducation costs (the municipal overburden) are inexorable.

Since the cities' ability to raise taxes is limited by economic and political factors as well as by the State Constitution (art VIII, § 10; *Hurd v City of Buffalo,* 34 NY2d 628), a consequence of the inexorable municipal overburden is that the cities have less funding available for educational services.[1] The cities' reduced educational resources are therefore not the outcome of an optional preference, but the inevitable result of circumstances beyond their control.[2]

At the same time, a number of special educational problems compete for the cities' limited educational resources (the educational overburden). The cities have a larger proportion of pupils with special educational requirements — children who fail to achieve ("below minimum competence" students or "PSEN"), children who have difficulty with the English language, children who are excessively absent from school and children with physical and emotional handicaps. The high absentee rate of the cities' pupils is inexorable.

The State education aid formula awards aid in inverse proportion to real property wealth and adjusted gross income and employs attendance as a factor in both the measure of the district's ability to support education and the measure of the district's education needs. Since, with the exception of Buffalo, the cities' real property wealth and adjusted gross income are above the State average and since the attendance rate of the cities' pupils is comparatively low, the formula awards less than average aid to city students.

The disproportionate impact of the education aid legislation on the cities' public school children is well established. The intervenor cities have 37% of the State's public school pupils, including 56% of the State's "below minimum competence" students, but will receive only 32.9% of the State's education operating aid. New York City, with 33% of the State's public school enrollment, including 51% of

---

1. Summary, Research Findings and Policy Alternatives: A Second Interim Report of the New York State Special Task Force on Equity and Excellence in Education, Sept., 1980, pp 6-7.

2. Zelinsky, Educational Equalization and Suburban Sprawl: Subsidizing the Suburbs Through School Finance Reform, 71 Nw U L Rev 161, 165, 184-186, 189-190, 198, 203; *Robinson v Cahill,* 67 NJ 333, 351, 369.

the State's "below minimum competence" students, will receive only 29% of the State's education operating aid. Alternatively stated, for the school year 1981-1982, the intervenors will receive the following amounts of State operating expense aid per pupil unit: Rochester, $826; New York City, $931; Syracuse, $935; Buffalo, $1,075. The corresponding average amount for the rest of the State is $1,000. The intervenors enroll 57% of the most seriously handicapped students in the State's public schools (that is, pupils who have been found to require special programs 60% or more of each school day), but the additional aid received for such students will be $1,628 in New York City, $1,873 in Rochester, $2,088 in Syracuse and $2,212 in Buffalo. The corresponding average amount for the rest of the State is $1,921.

This discrimination against city students was recognized by the Regents who, in 1976, recommended a modification of the pupil count and the use of the same pupil measure for both fiscal capacity and need in order to provide a more equitable pupil count and greater equity.[3]

2.

In giving less aid to city students, the education aid formula has a disproportionately adverse effect not only on pupils from impoverished families, but also with respect to race, country of origin and alienage.

The cities' populations are multiracial and multiethnic and include a large number of immigrants from a host of countries. The Immigration Act of 1965 increased the size and diversity of Asian groups in New York City[4] and the proportion of "nonwhite" (i.e., black, Asian, American Indian and "other") persons in that city's population increased from 23.4% in 1970 to 39% in 1980.[5] In contrast, "nonwhites" constitute only 20.5% of the State's total population. Analysis reveals that 83% of the State's "nonwhites" live in the intervenor cities, 77% of them in New York City. New York City's population includes 74% of the State's blacks, 74.6% of the State's "Asian or Pacific

---

3. Major Recommendations of the Regents for Legislative Action 1977, Nov., 1976.

4. Hune, "Asian Americans in New York City", The Jewish and Ethnic Studies Project, Metropolis Booklet.

5. 1980 Census Bureau figures.

Islanders", 88.7% of the State's "others" and 84.7% of the State's persons of "Spanish Origin".

This diversity of population is reflected in the cities' public schools, particularly those of New York City. In 1974-1975, New York City had 78.2%, and the combined four intervening districts 84.4% of the State's "minority" students.[6] *At the time of the trial, 100,000 to 110,000 New York City students were unable to participate in school effectively in English,* and some of the cities' immigrant pupils were totally illiterate in their own tongues.[7] In 1979-1980, New York City had 76.9% and the combined four intervening districts had 83.1% of the State's black and "Hispanic" students.[8] Of the 963,048 students enrolled in the city's public elementary and high schools, 371,302 (38.6%) were "Black (not Hispanic Origin)", 286,693 (29.8%) were Hispanic, 36,880 (3.8%) were "American Indian, Alaskan Native, Asian or Pacific Islander", and the remaining 268,173 students (27.8%) were "white (not Hispanic Origin)".[9]

In giving less aid to the cities' students, particularly those of New York City, the education aid scheme has a disproportionate impact on the State's minority students.

### 3.

While disparate impact alone is not determinative of the constitutionality of the subject legislation and proof of discriminatory intent is required, the fact that the law bears more heavily on one race than another is one of the totality of relevant facts from which an invidious discriminatory purpose may be inferred. To determine whether invidious discriminatory purpose was a motivating factor, a sensitive inquiry into all available evidence of intent is required and disproportionate impact provides an important starting point *(Washington v Davis,* 426 US 229, 241-242; *Arlington Hgts. v Metropolitan Housing Corp.,* 429 US

---

6. IFF 162, citing Racial/Ethnic Distribution of Public School Students and Staff in New York State 1974-75, Table 2, Exhibit 147, A 2400. The word "minority" in the cited exhibit refers to the total of "Black and Spanish Surnamed American".

7. Students without facility in English spoke a wide variety of foreign languages, including Spanish, Chinese, Italian, Greek, French, Vietnamese and Russian.

8. Racial/Ethnic Distribution of Public School Students and Staff in New York State 1979-80, Table 2.

9. *Id.,* Table 1.

252, 265-266; *Personnel Administrator of Mass. v Feeney,* 442 US 256, 271-274).

Among the evidentiary sources as to intent are the historical background and the legislative history *(Arlington Hgts. v Metropolitan Housing Corp., supra,* pp 267-268). The foundation system, which for all practical purposes remains in effect today, was adopted in the Cole-Rice Law of 1925 (L 1925, ch 675). The Diefendorf formula adopted in 1962 was an effort to correct inequities arising under the 1925 law and certain benefits formerly denied to the large cities were extended to them. The 1974 legislation was enacted in response to a wide consensus of opinion that the Diefendorf formula had not remedied the inequities. Yet today, 19 years after the adoption of the Diefendorf formula, the education aid legislation continues to have a substantial disproportionate impact on the public school children in the State's largest cities and the three fourths or more of the State's minority students who attend school in the intervening districts continue to receive proportionately less aid for their education.

The cases in which it was held that a discriminatory intent had not been proved are easily distinguished on their facts (cf. *Arlington Hgts. v Metropolitan Housing Corp.,* 429 US 252, *supra; Washington v Davis,* 426 US 229, *supra; Personnel Administrator of Mass. v Feeney,* 442 US 256, *supra).*

### 4.

In selecting the applicable standard of review, we have the right to find a stricter protective constitutional standard for New York than that set by the United States Supreme Court *(Minnesota v Clover Leaf Creamery Co.,* 449 US 456, 461, n 6) and in recent years, a number of State courts, New York included, have construed "state constitutional counterparts of provisions of the Bill of Rights as guaranteeing citizens of their states even more protection than the federal provisions, even those identically phrased." (Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv L Rev 489, 495; *Town of North Hempstead v Exxon Corp.,* 53 NY2d 747, concurring opn of FUCHSBERG, J., pp 754-756.)

The degree of importance accorded the right to an education and the equal protection principles applicable to discrimination with respect to race, alienage and country of origin are reviewed fully in Justice LAZER's scholarly opinion. Close scrutiny was held to be the appropriate test where aliens as a class were barred from tuition assistance for higher education *(Nyquist v Mauclet,* 432 US 1; cf. *Ambach v Norwick,* 441 US 68).

The subject legislation has a disproportionately adverse effect with respect to so important a right as education on the vast majority of the State's minority students. *Minority children with greater needs are receiving not equal, but less aid* (cf. *Matter of Bernstein v Toia,* 43 NY2d 437). The number of children affected is enormous. Three quarters of New York City's approximately 1,000,000 students fall outside the classification of "white (not Hispanic origin)". One hundred thousand to 110,000 New York City pupils were unable to participate in school effectively in English at the time of the trial and 51% of the State's "below minimum competence" students are enrolled in the city's schools.[10]

All of the above circumstances supply a cogent reason for the application, if not of strict scrutiny, of the heightened scrutiny test developed in *Alevy v Downstate Med. Center of State of N.Y.* (39 NY2d 326, 336), and the State does not contend that no less objectionable financial aid scheme will advance the State's interest in the continuation of local control. Even under the "less than strict" but not yet "'toothless' standard of review",[11] the statutory scheme fails. When noneducational costs are inexorable, the cities, have reached their taxing limit and the educational problems are ever more challenging, the extent of local control has become so limited that it can scarcely be maintained

---

10. In *San Antonio School Dist. v Rodriguez* (411 US 1, 11-12), the total enrollment in the Edgewood district was only 22,000 students. In *Lau v Nichols* (414 US 563, 572), the number of children involved of Chinese ancestry who did not understand English was 1,800 and Justice BLACKMUN concurred on the ground that "a very substantial group" was involved.

11. *Matter of Fay,* 44 NY2d 137, 144, app dsmd *sub nom. Buck v Hunter,* 439 US 1059; *Matter of Lalli,* 43 NY2d 65, 67, affd *sub nom. Lalli v Lalli,* 439 US 259; *Trimble v Gordon,* 430 US 762, 766-767; *Caban v Mohammed,* 441 US 380, 392, n 13.

that the statutory scheme *substantially* serves a *substantial* State objective.[12]

5.

For the reasons stated, I concur with Justice LAZER in the modification of the judgment.

HOPKINS, J. P. (concurring in part and dissenting in part). I agree that the present legislative scheme for funding public education violates the education article of the State Constitution (NY Const, art XI, § 1). I do not agree that the equal protection clause of the State Constitution has been breached (NY Const, art I, § 11). My disagreement proceeds, however, not so much from a divergence with the analysis of the proof and findings made by my brother LAZER, an analysis which admirably condenses the evidence in this difficult and intricate case, but rather from a differing view of the essence and purpose of the several tests which have been devised to determine whether there exists a violation of the equal protection clause.[1]

I

Our Constitution declares that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof" (NY Const, art I, § 11). This language parallels in almost the same words the command of the Fourteenth Amendment: "nor shall any State * * * deny to any person within its jurisdiction the equal protection of the laws" (US Const, 14th Amdt, § 1). There appears no reason to suppose that the purpose and effect of the two provisions are or should be different *(Dorsey v Stuyvesant Town Corp.,* 299 NY 512, 530-531, cert den 339 US 981); at the same time it is clear that the State courts must be the final arbiters of the interpretation to be given to the State Constitution. Nevertheless, at the very least the interpretation made by the Supreme Court of the United States concerning the meaning and effect of the Fourteenth Amendment must be granted great respect by the State

---

12. Cf. *Kramer v Union School Dist.,* 395 US 621, 623, n 3; *San Antonio School Dist. v Rodriguez,* 411 US 1, 51, n 108; *Matter of New York City School Bds. Assn. v Board of Educ.,* 39 NY2d 111, 119.

1. The thorough and painstaking review of the facts in the opinion written by Justice *L. Kingsley Smith* at Trial Term *(Board of Educ. v Nyquist,* 94 Misc 2d 466) must be commended. The magnitude of the evidence and the vast significance of the issues in the case are equalled by the careful attention and reflection which his opinion demonstrates.

courts when they are called on to construe the equal protection clause of the State Constitution.

Hence, we should not only acknowledge the binding judgment of the Supreme Court in *San Antonio School Dist. v Rodriguez* (411 US 1) concerning the meaning of Federal equal protection, but also pay full regard to the reasoning by which that judgment was reached by the Supreme Court, when we determine the meaning of the equal protection article in the State Constitution. Justice POWELL, in writing for the majority in *Rodriguez,* found no discrimination against the plaintiffs under the Texas statutes, because of the finding that their claim of comparatively little wealth did not result in a deprivation of educational opportunity *(supra,* pp 19, 23-24).

So here, despite the plethora of proof produced by the plaintiffs and the manifold findings of Trial Term, there is neither proof nor finding that any of the individual plaintiffs suffered an absolute deprivation of educational opportunity or even a substantial diminution of educational opportunity. What the plaintiffs' proof suggests circumstantially is that the complaining school districts employ a lower ratio of teaching staff to students, that their teaching staff may not possess as extensive experience or training, that they do not have as many guidance counselors, psychologists and ancillary staff, and that their curricula are more limited in subject matter than those that exist in wealthier districts.

Even so, such circumstantial findings do not show that the basic educational policy of the State in marshaling an adequate foundation for its students has been remotely violated. It is doubtful whether cost alone is decisive of the quality of education. "[T]he basic lesson to be drawn from the experts at this point is the curent *[sic]* inadequacy of social science to delineate with any clarity the relation between cost and quality" (Coons, Clune & Sugarman, Private Wealth and Public Education, p 30; see, also, Note, A Statistical Analysis of the School Finance Decisions: On Winning Battles and Losing Wars, 81 Yale L J 1303). Moreover, it is not at all clear, and, indeed, what material is available is to the contrary, that more expenditures results in increasing learning skills (Carrington, Financ-

ing the American Dream: Equality and School Taxes, 73 Col L Rev 1227, 1241-1243). The Board of Regents prescribes the educational program for the students in the State, and there is no proof in this record that any of the school district plaintiffs are acting in violation of that program in carrying out this obligation to the individual plaintiffs. Though in accordance with that program the content of the curriculum may differ among the school districts in the State, that in itself does not denote that the students in the school districts offering the narrowest curriculum are necessarily deprived, provided that such school districts comply with the basic educational program of the State. Nor does the fact that certain school districts are able to restrict class size or maintain larger staff personnel to provide ancillary or administrative services lead to the conclusion as a matter of law that the school districts unable to match the breadth of such services deny their students the benefit of the basic educational program.[2]

Leaving aside, therefore, the unproved claim of pupil deprivation, the plaintiffs are reduced to the plaint that their financial resources, based on real property assessments, do not equal the resources of other school districts. But this is a plight not derived from educational disadvantage; it is a common plight for a large number of municipal units, whether county, city, town, village, special service district, or authority. Whenever geographical area measures the unit, it follows that the value and kind of land and improvements within the unit will vary, and that equality of resources of the units (or category of units) cannot be attained, without at the same time destroying community lines.

The inequality of resources within school districts thus presumed, the claim of unequal protection of the law must therefore fail, unless we are to say that the State cannot delegate a constitutional function to municipalities except

---

2. Two illustrations: (1) The one-room school house in a school district may or may not provide as good instruction as another school district containing many school houses having a grade to a room, depending on the skills and dedication of the teacher and the interest of the students; (2) the access to the great museums within the City of New York enjoyed by the students in its schools may or may not be an advantage over school districts so distant from the city that their students are foreclosed from using such facilities, depending, again, on the bent of the teachers and the curiosity of the students.

by equalizing the financial burden in each municipality out of State funds. But the delegation of State functions to its municipalities and the financing of such functions out of real property taxes levied by the individual municipality is so much a part of the fundamental pattern of our government that to assert a claim of a violation of equal protection of the law, because the resources of the municipality are unequal, is at complete odds with the historical development of the law, as well as the elementary structure of State government. It cannot be said, for example, that because the financial resources of the counties of the State vastly differ, that the court function or law enforcement function within the counties may not be delegated by the State without the use of State funds, or that as a consequence a constitutional violation of equal protection of law must be implicated.[3]

Indeed, the claim in this case of an infringement of equal protection, if sustained, essentially would require that other constitutional mandates must be similarly treated. For example, the Constitution imposes the support of the needy on the State and its subdivisions, to be provided "in such manner and by such means, as the legislature may from time to time determine." (NY Const, art XVII, § 1.) Again, the same constitutional strictures are laid on the State to be discharged by the Legislature with respect to public health (NY Const, art XVII, § 3), the care of persons suffering from natural disorders (NY Const, art XVII, § 4), and public housing (NY Const, art XVIII, § 1). Thus, the argument of the plaintiffs underpinning their claim of constitutional discrimination on the ground of disparity of wealth proves too much and would, if accepted, effectively destroy the long-established governmental principle that the municipality can be expected to deal competently with State functions delegated to it (see, generally, *Robinson v Cahill*, 62 NJ 473, cert den *sub nom. Dickey v Robinson*, 414 US 976).

In addition to the general claim of unequal protection, there must be considered the claim of municipal overbur-

---

3. The cost of some, not all, court functions has been assumed by the State; this was a voluntary undertaking and it was never considered that the State was constitutionally required to accept that burden.

den advanced by the intervenor-plaintiffs. Municipal overburden rises to the point of constitutional discrimination in the area of education, say these plaintiffs, when the cost of that and other services furnished by them are disproportionately high, because of population characteristics and other factors beyond the control of the city, and thus cut down the amount available to be applied to general educational needs. It should be observed that municipal overburden is not uniquely a big city problem (Coons, Clune & Sugarman, Private Wealth and Public Education, pp 233-234, particularly n 20), and in the opinion of certain scholars in the field, "is important to think about but not essential to act upon, at least until we have a proper power equalizing system the operation of which can be evaluated" (id., p 241) — thus making it appear that it is subsidiary to the general claim of unequal protection.

In any event, municipal overburden as a claim of discrimination is a variant of the general assertion of unequal municipal resources. It is not, again, a contention that pupils within these schools fail to receive the basic education program prescribed by the State; it is, rather, a claim that the intervenor cities, because of conditions not confronted in other municipalities, and because of the existence of other mandated services furnished to their inhabitants, are compelled to restrict the amount of appropriations for education. It is therefore a claim founded on wealth or lack of wealth of the city, not the wealth or lack of wealth of the individuals within the city. Hence, the argument of municipal overburden conforms to the claim of the other plaintiffs that their financial resources are not equal to the resources of other more fortunately located municipalities. It is beyond the power of this court in this litigation to determine whether the appropriations of the intervenor-plaintiffs have been wisely directed or reasonably applied, or whether their budgets are fairly divided in terms of priority of need between the competing services, such as police, fire, health, housing and transportation, and it is, equally, beyond the power of the court to determine whether the resources of the intervenor-plaintiffs can otherwise be employed so that their educational needs can be met.

## II

In my view, accordingly, the proof of the plaintiffs has not established constitutional discrimination, no matter what test of equal protection of the law is applied. However, in any event, in the context of this case I would choose the "rationality" test.

Justice LAZER's opinion aptly and thoroughly describes the three tests of equal protection currently in vogue: the "rationality" test, the "strict scrutiny" test, and the "heightened scrutiny" test. Peculiarly, although all the tests measure the claim of unconstitutionality, each has its own factors of analysis, and the choice of the test to be applied predestines the ultimate result in almost every case. But the choice of the test itself is not determined in definable terms, and it is for that reason practically intuitive and subjective. Thus, in the words of Justice REHNQUIST, the tests often "all too readily become facile abstractions used to justify a result." (Rostker v Goldberg, 453 US __, __, 101 S Ct 2646, 2654.) This outcome perhaps inevitably follows whenever a decision hinges on the adoption of one of several alternative tests; it seems particularly unfortunate when constitutional issues of immense importance hang in the balance.[4] There are signs that the Supreme Court is retreating from the use of all three tests (Rostker v Goldberg, supra, pp __, 2658-2659 [claim of gender-based discrimination]; Schweiker v Wilson, 450 US 221, 230-234 [claim of mentally ill patients for Social Security benefits]; Jones v Helms, 452 US 412, __, 101 S Ct 2434, 2442 [claim that right to travel was violated]) to return to the standard of persons similarly situated under law receiving dissimilar treatment, a standard adhered to in the past by our courts (see, e.g., Matter of Engelsher v Jacobs, 5 NY2d 370, 374; Matter of Greenburgh No. 11 Federation of Teachers v Helsby, 41 AD2d 329, 330-331 [COOKE, J.]). Nevertheless, I am in accord with Justice

4. Diffidently, there is suggested a single test for the consideration of equal protection claims, based on these questions: (1) What was the intention of the authors of the challenged statute? (2) Does the statute in fact, or in the manner of its application, carry out that intention? (3) Are the individuals suing treated materially differently from others similarly situated by reason of the intent or the application of the statute as a matter of law or fact?

LAZER's conclusion that presently the three tests exist concurrently.

I am further in agreement that in this case no claim of fundamental constitutional right or suspect classification arises (see *Matter of Levy,* 38 NY2d 653, 658; *Lombardi v Nyquist,* 63 AD2d 1058, 1059, mot for lv to app den 45 NY2d 710). I differ from the majority in believing that the "heightened scrutiny" test *(Alevy v Downstate Med. Center of State of N.Y.,* 39 NY2d 326) must apply. I note that *Alevy* considered a claim of reverse discrimination not involved here, and that the Court of Appeals has not demonstrated any disposition to enlarge the "heightened scrutiny" test to subsequent cases where educational legislation was the point of attack.[5]

I am instead of the opinion that the traditional test of "rationality" is the appropriate standard of review. From the beginning of the Legislature's concern with the educational needs of the State, the concept of local control linked with local taxing power has been the primary focus in designing and effectuating educational policy. Hence, in 1795 the Legislature enacted a statute appropriating $20,000 yearly for five years to be apportioned among the counties of the State "for the purpose of encouraging and maintaining schools in the several *cities and towns",* provided that the areas so benefited should raise by local taxation a sum equal to the amount so apportioned (L 1795, ch 75; emphasis supplied). In 1812 the Legislature directed that the towns were to be divided into school districts, with the imposition of a local tax optional with each town (L 1812, ch 242), but within two years the imposition of a local tax was required by the Legislature (L 1814, ch 192). Charles Lincoln concluded that "[i]t is a noteworthy feature of our school system that this policy of local supervision persisted through numerous important changes and developments" (3 Lincoln, The Constitutional History of New York, p 539).

---

5. Two years after the decision in *Alevy* the Appellate Division in *Lombardi v Nyquist* (63 AD2d 1058) held that the "rationality" test should be applied to article 89 of the Education Law, and leave to appeal was denied by the Court of Appeals (45 NY2d 710).

It is evident from the presently effective statutes that the concept of local control has continued and never been abandoned. Though the Board of Regents is empowered to establish educational policies (Education Law, § 207; cf. *Moore v Board of Regents of Univ. of State of N.Y.*, 44 NY2d 593), and the Commissioner of Education is granted the authority of enforcement of laws relating to the educational system (Education Law, § 305, subds 1, 2; § 309; cf. *James v Board of Educ.*, 42 NY2d 357), the Legislature has conferred broad and comprehensive powers on the locally elected and appointed officers of school districts to operate and maintain the schools of the State (Education Law, §§ 1604, 1709, 1805, 1903, 1950, 2503). The State has contributed to the local schools by appropriations of State aid in varying proportions throughout the years; even so, the concept of local control, in contrast to the concept of centralization, has been uniformly continued by the Legislature. The Legislature has, however, enacted certain basic standards of quality and curriculum which must be satisfied (Education Law, §§ 801-811, 3204). Beyond these basic requirements the local school districts are free to add or discontinue at their option other courses of instruction.

The concepts of home rule and local fiscal management are deeply rooted in the structure of our State government.[6] Accordingly, under the test of "rationality", the Legislature could legitimately find that school districts are proper means by which the operation and financing of schools within the State shall be accomplished (cf. *Matter of Board of Educ. v City of New York*, 41 NY2d 535). That the school districts do not possess equal potentials of taxation is inherent in the geographical compositions of the districts, as has been discussed above.

The "heightened scrutiny" test, in my mind, does not therefore apply. When the Legislature has chosen a legitimate and constitutionally recognized method to discharge a State function, it is inappropriate to inquire whether that

6. The strength of the State's commitment to these objectives was plainly displayed in 1969 by the addition of article 52-A to the Education Law, establishing the community school district system in New York City (L 1969, chs 330, 422) and by the legislative findings in 1972 (L 1972, ch 29, § 1) which in part stated that "the decentralization of the New York city school system is an innovative experiment in education" (cf. *Matter of New York City School Bds. Assn. v Board of Educ.*, 39 NY2d 111, 119-120).

function could be achieved by another method less detrimental to the plaintiffs (cf. *Matter of Levy,* 38 NY2d 653, 658, *supra; Robinson v Cahill,* 62 NJ 473, 492, *supra; Olsen v State ex rel. Johnson,* 276 Ore 9).

III

The claim that the prevailing statutes violate the education clause of the State Constitution in my view has been established. Our Constitution calls on the Legislature to "provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." (NY Const, art XI, § 1.) There are several key ideas conveyed by the single sentence. First, the constitutional duty is cast on the Legislature; second, that duty includes both the maintenance and support of a system of common schools; third, the system shall be free to all children of the State.

The word "support" clearly indicates financial backing. The word "system" has large implications, and various connotations from its use can be drawn, but in the context the main lexicographical meaning seems most pertinent — that is, that a system is a whole composed of parts in orderly arrangement according to some scheme or plan; an organized scheme or plan of action; an orderly or regular method of procedure (Oxford English Dictionary [1971 ed]).[7] Cases in other jurisdictions construing similar provisions in their own Constitutions have arrived at the same meaning (see, e.g., *Kennedy v Miller,* 97 Cal 429, 432; *State ex rel. Warren v Ogan,* 159 Ind 119; *Miller v Childers,* 107 Okla 57; *Northshore School Dist. No. 417 v Kinnear,* 84 Wn 2d 685). Frank P. Graves, at one time State Commissioner of Education in New York, writing in 1947 at the time of a revision and recodification of the Education Law, said that almost from the beginning of statehood "the need was felt for *an organized and efficient* system of popular education throughout the state." (Graves, Development of the Educa-

---

7. More specialized definitions correspond. "A system is a group of components integrated to accomplish a purpose" (5 Encyclopedia of Education, The MacMillan Co. and the Free Press, 1971, p 583). In the same digest it is remarked that an educational system is composed of several subsidiary systems, such as the fundamental instructional system, and supportive systems, one of which is the financial system, and that a supportive system should not impose unreasonable constraints on the instructional system *(id.,* pp 583-587).

tion Law in New York, McKinney's Cons Laws of NY, Book 16, Education Law, §§ 1-600, p XIV; emphasis supplied.)

As we have seen, the first statute authorizing and encouraging the establishment of public schools granted State funds for that purpose (L 1795, ch 75), although the first constitutional command to the Legislature to maintain and support public schools was not adopted until 100 years later in the Constitution of 1894. During the intervening years, State aid had been furnished to the school districts through the common school fund and direct grants (Graves, *op. cit.,* at pp XVII-XXI), so that the language of the education article must have been selected with full knowledge and approval that State support was to be continued by the Legislature according to a *system.*

As a result of the report of the Education Finance Inquiry Commission of 1921-1924, the foundation grant came into being (Coons, Clune & Sugarman, Private Wealth and Public Education, p 63). The foundation grant was so formulated that a school district would tax at a uniform rate to yield enough revenue to pay for what was considered a satisfactory offering of educational services in the richest district. Deficiencies were to be supplied by an equalization grant from the State (4 Encyclopedia of Education, The MacMillan Co. and the Free Press, 1971, p 35). Later modifications of the plan were made through the Cole-Rice Act (L 1925, ch 675) and the Friedsam formula (L 1927, ch 572), itself revised from time to time (see, e.g., L 1945, ch 579; L 1947, ch 7), which based State aid on grants made in inverse ratio to the school district's assessed valuation. By such means, the wealthier districts were limited in the receipt of State funds.

In 1962 the Legislature deserted the foundation grant plan, following a new study made by the Diefendorf Committee (Joint Legislative Committee on School Finance), and enacted a "shared-cost" program (Coons, Clune & Sugarman, *op. cit.,* pp 182-188). By 1974, when this action was commenced, other amendments had in the meantime been made to the program, the results of which most charitably can be said to represent piecemeal modifications and the enactment of special laws reaching a level of complexity so as to negate the existence of a basic State-

wide fiscal *system* for education (Mort, Unification of Fiscal Policy in New York State, in Benson, Perspectives on the Economics of Education, p 341). One of the features of the modifications made — the flat grant — clearly destroys the idea of uniform support (Coons, Clune & Sugarman, Private Wealth and Public Education, *op. cit.,* pp 186-187).

Merely a reading of the primary statutes detailing the conditions of distribution of State aid to the school districts makes clear the maze of the convoluted intricacies and provisos of the grants and that a constitutional system no longer exists. If once a uniform and integral system of State aid had been enacted, the innumerable amendments and modifications requiring payments of State aid under flat grants or hold harmless formulas, render the present plan a perversion of the constitutional mandate for a system (cf. *Seattle School Dist. No. 1 v Washington,* 90 Wn 2d 476; Chin, An Analysis and Review of School Financing Reform, 44 Fordham L Rev 773).

Book 16 of McKinney's Consolidated Laws of New York (Education Law, §§ 3001-5500) contains, in reference to section 3602 of the Education Law, the basic statute for the calculation of State aid, a total of 33 pages, covering complex definitions, involved computations, minimums, special aid formulas, ceilings, and arcane excess cost and high tax provisions; the description of the amendments to section 3602 for the years of 1963 to 1980 adds another 18 closely printed pages.[8]

The Legislature introduced in 1980 and amplified in 1981 yet another variable into the computation in the form of a State average income to be compared with the average income in each school district.

The actual operation of the statutory scheme embodied in the statutes as of 1974 is discussed at several points in Justice SMITH's opinion at Trial Term *(Board of Educ. v Nyquist,* 94 Misc 2d 466, 483-485, 503-509, *supra)* and in the majority opinion, and it is unnecessary to reiterate that

---

8. Of course, the 1981 amendments are not included (L 1981, ch 53). In addition to the provisions of section 3602, there are State aid provisions in sections 3603-3609 and subdivision 5 of section 1950 of the Education Law. Furthermore, there are other scattered references in the Education Law concerning fiscal considerations (e.g., Education Law, §§ 3601, 3627), as well as sometime temporary provisions in the State budgets. No attempt is made here to catalogue all such provisions.

description. However, what needs to be stressed is that the 1974 complexities have been converted into a veritable jungle of labyrinthine incongruity by the 1978 amendments, inserting the so-called "two-tier" calculation, and the 1980 and 1981 amendments, adding the new factor of the average income of residents of the school districts. What began as a simple exercise of arithmetical proportions in the distribution of State aid has been distended in the last 30 years into a prodigious task. Moreover, the conception of a system geared to the foundation grant, or aid based on the fiscal needs of the school districts in terms of their respective wealth, has disappeared under the enveloping layers of contingencies and obscurity introduced by the contradictory effect of the flat grant and save-harmless provisions. The statutes now resemble a patchwork mounted on patchwork, an Ossa of confusion piled on a Pelion of disorder. Thus, the design of a uniform and harmonious system conceived by its nineteenth century authors had been frustrated and distorted by the twentieth century attempts of legislators to satisfy the conflicting demands of their constituents.[9]

## IV

For the reasons stated, I concur with the majority, but only to the extent that they find a violation of the education article of the State Constitution.

GIBBONS, J., concurs with LAZER, J.; WEINSTEIN, J., concurs in a separate opinion; HOPKINS, J.P., concurs in part and dissents in part in another opinion.

Judgment of the Supreme Court, Nassau County, dated December 22, 1978, modified, on the law and the facts (1) by deleting the final three sentences from decretal paragraph 1(a) and substituting the following: "The system presently impinges upon the important right of education

---

9. The New Jersey Supreme Court found similarly that the then current legislative provisions violated the education clause in the New Jersey Constitution (*Robinson v Cahill*, 62 NJ 473). The only difference between the New Jersey constitutional provision and the New York constitutional article is that in New Jersey the State Constitution directs the Legislature to "provide for the maintenance and support of a thorough and efficient system". (NJ Const, art VIII, § 4, par 1.) The adjectives in my view are redundant and do not enlarge the meaning of system (cf. *Seattle School Dist. No. 1 v Washington*, 90 Wn 2d 476; *Board of Educ. v Walter*, 58 Ohio St 2d 368; *Olsen v State ex rel. Johnson*, 276 Ore 9).

guaranteed to all children of this State by section 1 of article XI of the New York Constitution in the plaintiff and intervenor-plaintiff school districts. The system fails to further the asserted State interest of preserving local control over education in these districts. It also fails because there are methods of financing public school education which would further local control over education with less intrusion upon the right of education guaranteed to all children of the State. Accordingly, New York's public school finance system violates the equal protection clause of the New York State Constitution (art I, § 11)"; (2) by deleting from the penultimate sentence of decretal paragraph 1(c) the words "and irrational"; and (3) by deleting from the final sentences of decretal paragraphs 1(c), 1(d) and 1(e) the words "and of the Federal Constitution (the Fourteenth Amendment)" and substituting the following declaration: "New York's school financing system is constitutional under the Fourteenth Amendment to the Constitution of the United States." As so modified, judgment affirmed, without costs or disbursements.