OPINION OF THE COURT
Joseph Goldstein, J.
This is . an action for a declaratory judgment, wherein the State defendants move to change venue and for summary judgment; the plaintiff cross-moves for summary judgment and the individual members of the Board of Education of the Brentwood Union Free School District move to intervene.
At issue in this case is the interpretation of Laws of 1984 (ch 889), a statute designed to resolve one of the most pressing issues affecting our community today, State aid to education and the adjustments to the formula base upon which State aid is computed. Together with local property taxes, State funding has become the financial lifeblood which supports the public education of our youth.
The factual context of this dispute is the State defendants’ modification of plaintiffs tax base after consideration of several thousand challenged addresses reported to them by the Bay Shore School District. The addresses defendant Bay Shore disputed were added to the plaintiffs tax base which resulted in a substantial reduction of plaintiffs State aid to education in the 1985-1986 school year. The plaintiff complains that its State aid was decreased despite the fact plaintiff was not given an opportunity to (1) review the additions to its tax base; (2) challenge those additions which it believes to be erroneous; and (3) appeal the determination of the defendants. In addition, plaintiff contends the disputed legislation did not empower the defendants to unilaterally and selectively reduce plaintiffs State educational aid.
In this action, plaintiff challenges the manner in which the Commissioner of Education, the Commissioner of the Department of Taxation and Finance, and the Director of the Budget (the State defendants) implemented Laws of 1984 (ch 889). The statute at issue addresses the inaccuracies in the current system by which taxpayers report the school district in which they reside. That information is crucial since the State defendants base the amount of funding, i.e., "State aid to education”, which school districts may be entitled to receive on, among other things, the combined total gross adjusted income of the residents of each district.
*1107 Plaintiff asserts that the State defendants have misinterpreted the statute and acted beyond the authority it vests in them. In addition, plaintiff claims that said defendants applied the statute in a constitutionally defective manner.
The State contends that plaintiff has commenced a CPLR article 78 proceeding in the guise of a declaratory judgment action and that CPLR 506 (b) (2) warrants transfer of this matter to Albany County. Because a declaratory judgment action is the appropriate vehicle to challenge the State defendants’ implementation of the act, both on constitutional and other grounds, the section the State relies on is inapposite to this action (see, Matter of Morgenthau v Erlbaum, 59 NY2d 143, 150).
As to the State’s other basis for transfer, the court considers summary disposition of this matter appropriate, therefore, the argument that the "convenience of material witnesses and the ends of justice will be promoted” by a change of venue to Albany County is of no moment (cf., CPLR 510 [3]).
In the absence of opposition, the motion for leave to intervene is granted with respect to the individual School Board members who are also residents and taxpayers of the Brent-wood School District (see, CPLR 1013).
Turning to the motion and cross motion for summary judgment, the State defendants assert four bases for dismissal of the complaint which are procedural in nature. The State argues that the four-month Statute of Limitations applicable to an article 78 proceeding bars this action. However, as already stated, a declaratory judgment action, which is governed by a six-year Statute of Limitations (CPLR 213 [1]), is, in the opinion of this court, the appropriate method for a challenge to the State defendants’ implementation of the statute (Matter of Morgenthau v Erlbaum, supra, at 150; cf., Press v County of Monroe, 50 NY2d 695).
Furthermore, as Judge Lazer stated in Board of Educ. v Nyquist (83 AD2d 217, 219, 221):
"The educational command of New York’s Constitution is simple and direct: 'The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of the state may be educated.’ That simple sentence comprises the essential constitutional underpinning for a multifaceted fiscal and administrative structure encompassing a central authority, more than 700 school districts, and over 4,000 schools in which some 200,000 profes *1108 sionals conduct the education of 3,000,000 of the State’s children * * *
"Since State aid formulas are inadequate and often counterproductive in their equalization aspects, low-wealth districts cannot furnish what is obtainable elsewhere — smaller class size, more experienced and effective teachers, low student/ teacher ratios, broader curricula, extensive extracurricular activities, more modern equipment and special programs for both the disadvantaged and the specially gifted.”
The issues raised in this litigation are-vital to our children and their education. To attempt to hide this issue under the weight of administrative interpretation on procedural grounds would do great injustice to our public educational system. No administrative task force should assume such power without specific direction from the Legislature. Since such specificity is lacking, the court must assume the obligation to review the merits of the instant litigation. Accordingly, this court is satisfied that this action, which the State defendants assert was commenced approximately one year after the plaintiff received its initial reduced State aid payment in "early 1985”, is not time barred.
In addition, it is noted that the State’s papers do not establish if and when plaintiff was officially notified of the modifications to its total adjusted gross income base caused by addition of the majority of the taxpayers attributed to it by its neighbor, the Bay Shore District. Other than the Assistant Attorney-General’s assertion that distribution of State aid for the 1985-1986 school year commenced early in 1985, which is not evidentiary in nature, the State defendants offer no support for their assertion that the Statute of Limitations began to run more than one year prior to plaintiffs initiation of this action. Thus, even if it is assumed that the four-month Statute of Limitations is applicable, determination of when plaintiffs right to institute an article 78 proceeding accrued is impossible (cf., Solnick v Whalen, 49 NY2d 224). Accordingly, the State defendants have not established that this action is time barred.
The court also rejects the challenge to plaintiffs standing. While the plaintiff cannot attack the State defendants’ implementation of the act on the grounds that the statute is unconstitutional, the District can object to the State’s implementation of the law as being at odds with the statutory language (Matter of Jeter v Ellenville Cent. School Dist., 41 *1109 NY2d 283, 287). Furthermore, the members of the School Board who have applied for and have been granted leave to intervene without opposition from the State can, as taxpayers, challenge the reduction of State aid on constitutional grounds (see, e.g., Boryszewski v Brydges, 37 NY2d 361).
The State correctly argues that this court is without authority to award plaintiff a money judgment. Nevertheless, the court can direct that the Department of Education recalculate the District’s entitlement to aid.
The State also contends that neither declaratory nor injunctive relief is available to plaintiff since this action is essentially one for the recovery of the amount by which the Department of Education reduced the District’s 1985-1986 State aid. According to the State, such relief is available through an action for money damages in the Court of Claims. As has been stated, however, a declaratory judgment action is the appropriate vehicle to challenge the State defendants’ interpretation of the statute (Matter of Morgenthau v Erlbaum, 59 NY2d 143, 150, supra; cf., Press v County of Monroe, 50 NY2d 695, supra).
. Moreover, injunctive relief is the only method available to plaintiff to prevent the defendants without specific direction from the Legislature from reducing its aid in the future.
Turning to the substance of the applications for summary judgment, the State defendants assert that as a matter of law they are entitled to a judgment that they interpreted and implemented the act correctly. Plaintiff argues that it is entitled to summary judgment as to its claims that (1) the statute did not empower the State defendants to reduce its aid; (2) Brentwood’s Superintendent was entitled to access to the income verification information the pilot project generated; and (3) the statute is unconstitutional if the State defendants’ interpretation is correct.
The essence of this dispute is the manner in which the Interagency Task Force, created pursuant to section 3 of the act, perceived and carried out its statutory mandate. The Task Force consisted of representatives from the Department of Taxation and Finance, the Department of Education, and the Director of the Budget. Pursuant to a procedure which will be described, the plaintiff received $771,584 less in State aid in the school year 1985-1986 than it had in 1984-1985. Plaintiff also alleges that it will sustain a similar reduction for the school year 1986-1987 should the process developed by the *1110 temporary Interagency Task Force be applied again. Plaintiff alleges in its amended complaint and on its cross motion that Laws of 1984 (ch 889) has been misinterpreted by the defendants. In its complaint the District avers that the State defendants’ implementation of the statute was constitutionally defective, and, furthermore, in connection with its cross motion, the District argues that if movants’ interpretation is sustained, then the statute itself is unconstitutional.
There is no dispute that State aid to local school districts is distributed pursuant to a formula which, among other formulae, provides for aid in an inverse proportion to the combined adjusted gross income of school district residents. Put more simply, the less adjusted gross income a school district has, the more State aid based thereon it will receive.
Taxpayers identify the school district in which they reside by use of a three-digit code entered by taxpayers on their New York State income tax returns. There have been disputes between neighboring school districts as to the accuracy of this identification by the taxpayer. This data is extremely significant because, as noted, it has a direct effect on the amount of State aid a district receives.
Understanding this background and the resulting contest between school districts, the Legislature enacted Laws of 1984 (ch 889), the implementation and interpretation of which are now at issue before this court. The statute requires the Commissioners of Taxation and of Education and the Director of the Budget to enter into a cooperative agreement: "with respect to the validation and correction of the total New York adjusted gross income of identified school districts for use in the design and development of the appeals process. The term identified school districts shall be defined in such agreement so as to provide appropriate opportunities for validating the accuracy of income data for selected school districts.” (Emphasis added.)
In addition, the agreement was to provide at least the following: "(i) procedures to improve the accuracy of school district income data, in a manner which gives appropriate recognition to administrative feasibility and confidentiality implications; (ii) a methodology for determining where the incidence of incorrect reporting of school district codes by taxpayers may be the greatest; (iii) a process by which identified local school districts may review the basis upon which the total New York adjusted gross income reported for such *1111 districts was determined; (iv) the verification of permanent resident addresses reported by taxpayers for a given school district; and (v) the correction of verified inaccuracies.”
Section 2 of the statute provides for certain lists to be promulgated for the identified school districts to be used solely for the purpose of verifying the legal residence and school district of individuals who on their tax returns reported that they lived in an identified district.
Section 3 provides for creation of the temporary task force on income verification "to conduct a study of alternatives for the establishment of a statewide address match and income verification system to study and make recommendations with respect to improving and modifying the data used in distributing school aid to local school districts”. (Emphasis added.)
According to plaintiffs verified and uncontradicted amended complaint, in order to induce and encourage "Identified School Districts” to participate in the pilot program the State agreed to hold them harmless from any losses which they might sustain by reason of their involvement in the study.
The State defendants designated 24 identified school districts based on a formula which it was hoped would reveal the districts with the greatest number of taxpayers incorrectly deemed to be residing therein based on the current reporting method (i.e., the district taxpayers specify on their returns). It should be noted that notwithstanding the number of returns reported for the Brentwood School District (plaintiff) for 1983, 21,580, reflecting an adjusted gross income in excess of $405,000,000, the Brentwood District was not selected as an "identified” school district, but a neighboring district, defendant Bay Shore was selected. Bay Shore’s returns for 1983, reflected an adjusted gross income of slightly more than $383,000,000 (16,626 returns reported).
The conflict between Brentwood and Bay Shore typifies the problems which led to the enactment of chapter 889. The complaint challenges the right of the State defendants to utilize the data generated by the pilot project to recompute the State aid formula for nonidentified school districts. This court agrees with plaintiff in this regard. More important, perhaps, is the fact that the Task Force agrees, or at least it did until this litigation commenced.
In its report entitled Report of the Temporary Interagency Task Force on School Income Verification, which is undated but contains data following the first level verification, the *1112 Task Force discusses several difficulties and problems it had encountered.
"Preliminary results of the school district address review are providing a new insight into the dimensions of the income reporting problem. Thirty percent of the addresses reviewed by the school districts- required correction * * * Given this significant magnitude of change (as high as 55.0% for one district), it is becoming evident that additional districts should have an opportunity to participate in the appeals procedure begun for the identified school districts in 1984-85. This option should be available to all school districts on a statewide basis.
"The 1983 income data file is being used in the calculation of school aid in the 1985-86 school year. The task force recommends that legislation be enacted to allow the continued use of the 1983 income date for calculation of school aid in the 1986-87 and subsequent school years.
"If the law is not changed to authorize continued use of the 1983 file, the 22 identified districts will have to repeat the entire correction process. This is due to Tax and Finance’s computer systems limitations, which enabled corrections to be made only to the 1983 income tax file and prevented a permanent change in the data base.”
This insight by the Task Force has apparently not been adopted by the school aid authorities. While adjustment of the school aid based on the "first round verification” might have been valid for the identified school districts, 22 of which participated in the process (and all of which reported a decreased number of taxpayers, entitling them at least in theory to increased State aid), certainly there is not one iota of justification for reducing the State aid to those districts which are neighbors of the identified districts and which became the repository of the challenged tax return addresses. In Brentwood, the number of taxpayers added to its base were such that the District’s tally was increased from 21,800 returns to 25,450 returns and the New York adjusted gross income in the District went from $405,000,000 to more than $481,000,000. The defendant’s memorandum of law softly states: "it has been recognized that some degree of error is inherent in the state aid formula”.
The same might well be said of the actions taken by defendants in utilizing the proposed new system to reduce plaintiffs State aid based upon the addresses defendant Bay Shore challenged. The defendants take the position that chap *1113 ter 889 "mandates that the data collected from this process be used to compute state school aid allocations to all districts”. This court finds no support in the statute for this statement.
The statement by the defendant in its memorandum of law that "The chapter clearly mandates that the verification and appeals process be implemented exactly as State defendant did” is grossly exaggerated (emphasis added).
The Legislature made certain tools available to the Task Force and the first level of verification was implemented. There has been no appeals process designed or implemented except by commencement of this and similar lawsuits.
In fact, if one assumes the accuracy of the statement made by affiants on both sides, Brentwood has not even received a list of addresses challenged by defendant Bay Shore Union Free School District — which list would equal more than 25% of its "new” tax base. It may be correct to claim that by having defendant Bay Shore review an anonymous list of addresses and then challenge some 5,600 of them as not being located within its school district, the Task Force permitted Bay Shore to "appeal” its tax base. Realistically, however, all that has been accomplished is that Bay Shore and the other identified districts have been given an opportunity to "disclaim” certain taxpayers from their tax bases thus reducing their total adjusted gross income and increasing their entitlement to State aid.
This, however, is the evil of the Task Force methodology. The "challenged 5,600” are accepted as gospel and most are assessed against Brentwood. Brentwood has been denied the opportunity to examine, let alone "appeal” these "challenged 5,600”. And then perhaps the most inglorious act in this scenario is the attribution of the majority of the "challenged 5,600” to plaintiff which resulted in the disputed aid reduction.
The parties employ several words interchangeably. The State defendants assert that when they sent income tax data to the Bay Shore School District, this constituted implementation of an appeals process as contemplated by the statute. This court disagrees. If this process is intended to have any purpose, it is to "verify” the data base being used to formulate awards of State school aid.
An "appeal” in the usual sense given to the word is an action commenced by a party who believes himself to be aggrieved (school district) to a party in a position to correct *1114 that sensed grievance (the taxing authorities). What is described by defendants as an appeal is just the reverse and was an action performed pursuant to a directive by the Legislature.
Once the results of the "verification” were received, if an appeals process was in fact to be implemented, the Task Force should have notified Brentwood, permitted it to review the "challenged 5,600” and then perhaps consulted with representatives of both Bay Shore and Brentwood to determine "in an appellate process” where the challenged addresses should be allocated. No such effort was pursued. In fact, to the contrary, Brentwood was denied access to the list of the "challenged 5,600”, thereby depriving it of any appeal within the contemplated legislative and administrative process.
As noted previously, the State defendants use the words verification and appeals process interchangeably as though they were the same. They are not! While it may well be true that the initial list generated by the tax record data and supplied to Bay Shore was "confidential” the resulting list of the "challenged 5,600” was based upon a work product of Bay Shore, it could and should have been used as the basis of the contemplated appeal as between two neighboring school districts.
This court is satisfied that the statute is constitutional, but is equally persuaded that the manner of implementation and the revision of the school aid formula to adversely affect the nonidentified districts by reducing their State aid receipts without any appellate review is a denial of their rights and without support in chapter 889 as contemplated by the Legislature.
This court is not satisfied that the defendants have acted in accordance with the directives of the Legislature as set forth in chapter 889. All the data supplied to this court would indicate the contrary to be so. This is not a challenge to a State finance or budget enactment. It is a challenge to the manner the defendants interpreted and subsequently implemented the legislative directive of chapter 889. This court fully acknowledges the holding of the highest court of our State that: "In matters concerning the allocation of the public fisc, the courts do not review the Legislature’s wisdom or the propriety of their decisions * * * Rather, the scope of review is to determine whether a rational basis exists for the classification enacted by the Legislature. Particularly in matters *1115 concerning the State’s budget, equal protection does not require that all classifications be made with mathematical precision” (Matter of Tolub v Evans, 58 NY2d 1, 8).
That issue, however, is not before this court. There is no viable challenge directed to chapter 889, rather it is a challenge to the imprecise, unfair, unfinished, incomplete program designed by the Task Force and arbitrarily enforced against this plaintiff which is contested in this action. If thé taxing authorities had limited the school aid formula modification to those identified school districts which had responded to level No. 1 of the process (verification) Brentwood would have no valid complaint. But the taxing authorities apparently proceeded to change the entire State aid formula, accepting at face value the challenges of the identified districts, without any outside verification or appeal by the districts affected, thus diminishing the State aid to neighboring school districts. This has been done in an arbitrary manner, without implementing chapter 889 in compliance with its very terms.
Thus, the complained of reduction in State aid to Brentwood based upon "Bay Shore verification” is premature and without legislative direction. To that extent plaintiff shall have summary judgment, and shall have the State aid formula for the school years 1985-1986 and 1986-1987 recalculated without giving effect to the "Bay Shore verification”. The State defendants shall reimburse the Brentwood School District accordingly. Furthermore, the State defendants are enjoined from employing the Task Force’s proposed new system to calculate the State aid due Brentwood until an appeals process and the verification data are made available to the plaintiff.