OPINION OF THE COURT
Henry W. Lengyel, J.
Claim No. 70930, an unverified claim, was filed with the *277 Chief Clerk of the Court of Claims and served upon the Attorney-General on May 7, 1985.
The gravamen of the claim was that, in its calculation of State aid to be paid to the claimant for the 1984-1985 school year, the" defendant utilized erroneous data to determine the adjusted gross income wealth of the school district. Claimant further alleged that, as a consequence of such error, the amount of State aid computed and paid to claimant for that year was $1,232,602 less than the amount claimant would have received if the correct adjusted gross income data had been utilized.
The basic premise underlying State aid for school purposes may be simply stated as: the greater the district’s wealth, the lesser the State aid to be paid; or conversely, the poorer the district, the greater the State aid. Unfortunately, the simplicity of purpose cannot be reflected in the methodology utilized.
Pursuant to Education Law § 3601 the Commissioner of Education has the responsibility of apportioning amongst the various school districts the amount of money annually appropriated by the Legislature for the support of common schools. The manner in which the apportionment is to be made is controlled and dictated by Education Law § 3602 et seq. The complex apportionment formula mandated by section 3602 required, among other factors, that the Commissioner calculate the alternate pupil wealth ratio which is: "the number computed to three decimals without rounding obtained when the adjusted gross income of a school district for the calendar year prior to the calendar year in which the base year began divided by the total wealth pupil units of such district is divided by the statewide adjusted gross income per total wealth pupil unit as computed by the commissioner pursuant to regulations adopted by him for such purpose. Such statewide average gross income per pupil shall be established each year by the commissioner pursuant to such regulations approved by the director of the budget and shall be transmitted to school districts by March first. For aid payable in the school year nineteen hundred eighty-four — eighty-five, such statewide average shall be forty-three thousand eight hundred dollars. For the purposes of this paragraph, the income data shall be computed in accordance with regulations adopted by the state tax commission based upon personal income tax returns for the calendar year two years prior to the calendar year in which the current school year commences. ” (Education Law § 3602 [1] [k]; emphasis added; see, L 1984, ch 53, § 20, eif July 1, 1984.)
*278 Since 1981, the adjusted gross income of a school district, together with the assessed value of real property, has been used to calculate the fair apportionment of State funds for that school district. The measure of a school district’s real property wealth is, of course, available from the assessment rolls. However, the calculation of the adjusted gross income data poses a more difficult problem.
Tax Law § 658 (a) was amended in 1977 and the State Tax Commission was required, effective January 1, 1978, to "provide a space on the form of returns wherein the taxpayer shall indicate the school district in which the taxpayer is a resident” (see, L 1977, ch 309, § 1). The State Tax Commission also adopted regulations pertaining to the income data to be used by the Commissioner of Education.
20 NYCRR 2000.2 (c) (1) (ii) provided that a school district’s adjusted gross income shall be determined by "adding together for each school district all the amounts of New York adjusted gross incomes of resident individuals reported on the returns ascertained under subparagraph (i) of this paragraph, on which that same school district was clearly indicated.” After this data was collected and correlated by the Department of Taxation and Finance, it was transmitted to the Education Department which divided the adjusted gross income for each school district by the pupil census in the district to arrive at an adjusted gross income per resident pupil. This quotient was used in the aid formulas for apportionment of the school district’s State aid.
Unfortunately, problems developed because a percentage of taxpayers incorrectly reported their school district of residence. The problems created by this erroneous reporting were addressed by the Legislature when it enacted Laws of 1984 (ch 889).
Section 1 of chapter 889 added a new subdivision (25) to Tax Law § 171, the statute which sets forth the powers and duties of the State Tax Commission. This change in the Tax Law was effective August 5, 1984 and required the Commissioner of Taxation and Finance, the Commissioner of Education and the Director of the Budget to design, develop and implement a mechanism for resolving disputes regarding the Department of Taxation’s computation of a school district’s adjusted gross income. They were also directed to enter into an agreement to develop a procedure to identify where the taxpayers’ misreporting of the school district of residence had significantly *279 impacted the computation of a school district’s State aid; and, in such cases, to further verify the resident addresses of taxpayers and correct inaccuracies. Pursuant to this legislative mandate the Commissioners and the Director of the Budget established a "Temporary Interagency Task Force on School Income Verification”.
The undated Task Force Report was filed on or about January 10, 1985. It stated at page 2:
"Two major problems compromise the use of school district data from personal income tax returns. The problems are completeness (is every tax return attributed to a school district) and accuracy (does the 3-digit code entered on the tax form actually reflect the school district in which the taxpayer resides). Errors regarding completeness are known and measured. Errors concerning accuracy, while known to exist are not measured at the present time. For tax year 1983, the Department of Taxation and Finance received nearly 7 million personal income tax returns, of which 318,185 returns had neither a school district number or name and 59,503 had invalid county errors (i.e. the reported school district did not match the county of residence).
"Many taxpayers may be unaware of the names of the school districts in which they reside. Experience indicates that inaccuracies in the reporting of school districts may be the result of: (1) confusion between common post office address and multiple school district names, (2) a lack of knowledge on the part of many taxpayers as to their school district of residence, and (3) the desire on the part of some taxpayers to associate themselves with the name of a more prestigious neighboring school district or locality.”
Very apparently the Task Force used the 1983 tax data so that the still to be paid 1985-1986 State aid could be computed. It identified 24 school districts in which the number of 1980 personal income tax returns exceeded 67% of the 1980 United States census population over 17 years of age. Of these 24 districts, 22 chose to participate in the program.
The claimant, City School District of the City of Peekskill, was identified as one of the districts where there was a high incidence of misreporting by taxpayers of their school district of residence. A computer-generated printout of addresses of taxpayers claiming residence in said school district on their 1983 State tax returns was provided to the claimant’s superintendent of schools. He was instructed to verify whether or not *280 these addresses were located within the school district and to make necessary corrections. According to the claimant, 2,352 out of a total of 9,012 taxpayers incorrectly identified the Péekskill City School District as the district in which they resided. The adjusted gross income of those taxpayers should not have been attributed to the City School District; and, of course, this added indicia of school district wealth had caused a corresponding diminution in State aid.
As a result of the verification and correction process instituted by the defendant at the direction of the Legislature, the claimant’s allocation of State aid for the 1985-1986 school year was adjusted upward. The apportionment reflected the use of the 1983 district of residence corrections and the adjusted gross income of only those taxpayers whose identification of the claimant as their school district of residence was certified as correct.
In this action the claimant contends that the State of New York "improperly us[ed] the uncorrected 1983 income data for figuring the aid formulas” and as a result there was a $1,232,602 shortfall in the State aid for the 1984-1985 school year. The problem with claimant’s position is that only 1982 income data is relevant to State aid for 1984-1985. The controlling statute (§ 3602 [1] [k] quoted in full above) provided that "income data shall be computed in accordance with regulations adopted [and] based upon personal income tax returns for the calendar year two years prior to the calendar year in which the current school year commences” (emphasis supplied). The calendar year two years prior to 1984-1985 is 1982, not 1983. Certainly, the fact that the Interagency Task Force used 1983 data (apparently the latest available data) in the pilot program related to 1985-1986 State aid in 22 school districts does not mean that such data may also be used for 1984-1985 State aid. Claimant contends, however, that as the legislation (L 1984, ch 889) was effective on August 5, 1984, it was also entitled to a recomputation of its 1984-1985 Státe aid. Of course, the State aid for that period had already been computed on the basis of 1982 income tax data; and, in fact, the first payment of that aid was received on September 17, 1984. Under those circumstances, claimant’s contention that it was not seeking a retroactive application of the 1984 statute is not, in my opinion, accurate; and furthermore, had the State attempted to use the corrected 1983 data to compute the 1984-1985 aid, it would have violated the legislative fiat contained in section 3602 of the Education Law. To the extent that this *281 claimant believes it was deprived of aid to which it was entitled in past years, before the problem was identified and attempts were being made to rectify it, I believe it must seek its relief in the Legislature, not in the courts. This is particularly so in view of the competing interest involved; i.e., for every dollar gained by the City School District of the City of Peekskill in a lawsuit, the State would have to obtain reimbursement from an "overpaid” district, or pay twice. It is not too difficult to imagine the disastrous effect that a retroactive application of the Task Force findings would have on the public fisc. This becomes crystal clear when one examines the decision of Justice Goldstein in Brentwood Union Free School Dist. v State of New York (135 Misc 2d 1105) which pointed up the problems that even a prospective application of the statute (L 1984, ch 889) can create.
It is my opinion that claim No. 70930 does not state a cause of action within the jurisdiction of this court and must, therefore, be dismissed with prejudice; and, I so find. This opinion is to be filed contemporaneously with my order directing such a dismissal.